1   COOLEY GODWARD KRONISH LLP
    SETH A. RAFKIN (199166) (srafkin@cooley.com)
2   JOSEPH S. LEVENTHAL (221043) (jleventhal@cooley.com)
    4401 Eastgate Mall
3   San Diego, CA  92121
    Telephone:    (858) 550-6000
4   Facsimile:    (858) 550-6420

5   Attorneys for Defendants
    HORIZONTE LTDA, FERNANDO MARIA AGONSTINHO
6   CALDAS, JR., and ROBERTO SILVA RAMOS

7

8                    UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10                                           07 CV 1 0 6 4   L        WMc

11  PLATYPUS WEAR, INC., a Nevada              Case No.
    Corporation, PLATYPUS WEAR, INC., a
12  California Corporation, PW INDUSTRIES,     **NOTICE OF REMOVAL OF ACTION**
    INC., a California Corporation, and        **(DIVERSITY)**
13  ALEXANDRIA PONCE DE LEON, in her
    capacities as the Special Administrator of the
14  Estate of Dr. Franklin F. Offner and as the
    Trustee of Sylvia Caira Descendants' Trust,
15
                        Plaintiffs,
16
17              v.

18  HORIZONTE LTDA, a Brazilian limited
    partnership, FERNANDO MARIA
19  AGONSTINHO CALDAS, JR., an individual,
    ROBERTO SILVA RAMOS, an individual,
20  and DOES 1-50,

21                      Defendants.

22

23

24

25

26

27

28                        **□ ORIGINAL**

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

**PLEASE TAKE NOTICE** that defendants Roberto Ramos, Fernando Caldas Jr. and Horizonte Ltda., specially appearing, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 file this Notice of Removal of *Platypus Wear, Inc., et al. v. Horizonte Ltda, et al.*, Civil Action No. GIC 879491 (attached hereto as Exh. A), from the Superior Court of the State of California for the County of San Diego to the United States District Court for the Southern District of California. The Grounds for removal are as follows:

## I.   INTRODUCTION.

1.   In this civil action, *Platypus Wear, Inc., et al. v. Horizonte Ltda, et al.*, Civil Action No. GIC 879491 in the Superior Court of the State of California for the County of San Diego, Plaintiff Platypus Wear, Inc. ("Platypus Wear") a Nevada corporation, alleges that Defendant Horizonte Ltda ("Horizonte"), a Brazilian Limited Liability company, and two of its Brazilian partners, Roberto Ramos and Fernando Caldas Jr., have "stolen" certain United States, European and Japanese trademark applications and registrations owned by Platypus Wear.

2.   This federal Court has original jurisdiction over this matter under 28 U.S.C. § 1332, because the amount in controversy exceeds the sum or value of $75,000 exclusive of costs or interest, and is between citizens of citizens of a State and citizens or subjects of a foreign state.

3.   Moreover, Plaintiffs have already made the same allegations, alleging theft of the same trademark applications and registrations by the same individuals, much earlier in Platypus Wear Inc., et al. v. Clark Modet, et al., Case No. 06-20976-CIV-MORENO, which has been pending since April 2006 before the United States District Court for the District of Florida (the "Florida Federal Court action").  In the year since that Florida federal court action was filed, it has already been the subject of extensive motions and discovery, including lengthy depositions taken in Portugal.

4.   Defendants therefore seek to remove this State Superior Court civil action, filed in February 2007, to this federal court.  Upon removal, Defendants will seek to transfer the action from here to the United States District Court for the District of Florida, where, in the interests of judicial efficiency, it may be consolidated with the pending Florida Federal Court action.

1.

1    Defendants further contend that this action should be dismissed for insufficient service of process.

2    **II.     THIS NOTICE OF REMOVAL IS TIMELY FILED.**

3         **5.**     Defendant Roberto Ramos (a former officer of the Brazilian Limited Liability

4    company Horizonte, which he left in January 2007) has received no service of process in this

5    action, and had no notice of this action until June 10, 2007.

6         **6.**     Promptly upon learning of the Superior Court action, he authorized the

7    undersigned counsel to represent him and to file this removal.

8         **7.**     The other two Defendants, Horizonte, and Fernando Caldas Jr., one of its officers,

9    have not been properly served in this action or notified of it.

10        **8.**     On June 9, 2007, the undersigned counsel first learned that Plaintiffs had filed a

11   "Proof of Service" in this action.  The "Proof of Service" consisted of a certified mail green card

12   signed for by an unidentified person.  This unidentified person, counsel have just learned, was not

13   a Horizonte employee, but a college intern at Horizonte, filling in for the regular receptionist

14   during lunch. Presented with the certified package, he informed the letter carrier (in Portuguese,

15   as he does not speak English) that he was not authorized to receive the package.  The letter carrier

16   replied that even though the package would be returned to the Post Office undelivered, he

17   nonetheless had to sign for it.  He accordingly signed for the package, and watched the letter

18   carrier fill out a form indicating that it was returned undelivered.   At all times, the postal

19   employee retained possession of the package, and at no time did Defendant Horizonte Ltda. or

20   Defendant Fernando Caldas Jr. have possession of it.   The green card Plaintiffs offered as a

21   "Proof of Service" thus fails to prove receipt of service.

22        **9.**     Defendants Roberto Ramos, Horizonte, and Fernando Caldas Jr., having received

23   notice of this action only very recently, and not through proper service of process, thus file this

24   Notice timely pursuant to 28 U.S.C. § 1441.

25   **III.    THIS COURT HAS SUBJECT MATTER JURISDICTION.**

26        **A.     The Amount in Controversy Exceeds $75,000.**

27        **10.**    It is apparent from the face of the complaint that the Plaintiffs seek compensatory,

28   actual, incidental, and special punitive damages in an amount in excess of $75,000.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

**NOTICE OF REMOVAL OF ACTION**

11.     The Plaintiffs' Complaint in the Florida federal action, for the same alleged "theft" of the same intellectual property, avers in paragraph 2 that, "This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3) because the amount in controversy exceeds $75,000, exclusive of interest and costs...."  (Florida Federal Court Complaint, ¶ 2, attached hereto as Exh. B.)

12.     Moreover, Defendant Horizonte contends that certain existing trademark registrations at issue between the parties are legitimately its own, not Platypus Wear's, and that deprivation of this intellectual property would inflict damage upon it in excess of the jurisdictional amount.

13.     There is, therefore, a reasonable probability that the amount in controversy satisfies the federal jurisdictional amount.

**B.      The Action is Between Citizens of Different States and Citizens or Subjects of a Foreign State.**

14.     Plaintiff Platypus Wear, Inc. is a corporation incorporated under the laws of Nevada.

15.     According to the Complaint, plaintiff Platypus Wear, Inc. is a dissolved corporation incorporated under the laws of California.

16.     According to the Complaint, PW Industries is a now dissolved wholly owned subsidiary of Platypus Wear, Inc.

17.     According to the Complaint, plaintiff Alexandra Ponce de Leon is an individual residing in the State of Illinois.

18.     Horizonte Ltda., is a Brazilian limited liability company with its principal place of business at Av. Ibirapuera, 810 Sao Paulo Brazil 0402800.

19.     All other named Defendants are citizens of Brazil.

20.     Plaintiffs have averred in the Florida Federal Court action that, "This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3) because the amount in controversy exceeds $75,000, exclusive of interest and costs, is between citizens of different states and citizens or subjects of a foreign state...."  (Florida Federal Court Complaint, ¶ 2.)

3.

21. Accordingly, diversity of citizenship exists because the matter in controversy is between "citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2).

IV. **THE PROCEDURAL REQUIREMENTS FOR REMOVAL ARE SATISFIED.**

22. This Notice of Removal is timely according to 28 U.S.C. § 1446(b).

23. The Defendants, in good faith, believe that the amount in controversy exceeds $75,000, exclusive of costs and interest, and complete diversity of citizenship exists.

24. The United States District Court for the Southern District of California embraces the county in which the state court action is now pending, therefore this action is properly removed to the Southern District of California pursuant to 28 U.S.C. § 84(d).

25. Pursuant to 28 U.S.C. § 1446(d), the Defendant is filing written notice of this removal to all parties and will file a notice with the clerk of the State court in which this action is currently pending.

**WHEREFORE**, Horizonte respectfully moves this action from the Superior Court of the State of California to the United States District Court for the Southern District of California pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

Dated: June 11, 2007

COOLEY GODWARD KRONISH LLP
SETH A. RAFKIN (199166)
JOSEPH S. LEVENTHAL (221043)

Seth A. Rafkin (199166)
Attorneys for Defendants
HORIZONTE LTDA, FERNANDO MARIA AGONSTINHO CALDAS, JR., and ROBERTO SILVA RAMOS

546593 v1/SD

Exhibit A

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Michael H. Riney, Esq. (116137)  Karen B. King, Esq. (167568)  VANTAGE LAW GROUP A.P.C.  501 West Broadway, Ste. 2020  600 West Broadway, Ste. 950  San Diego, CA 92101  San Diego, CA 92101  Telephone: (619) 702-2301  Facsimile: (619) 702-2401  TELEPHONE NO.: (619) 330-3000  FAX NO. *(Optional):* (619) 330-3010  E-MAIL ADDRESS *(Optional):*  ATTORNEY FOR *(Name):* Plaintiffs Platypus Wear, Inc., et al. | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
STREET ADDRESS: 330 West Broadway
MAILING ADDRESS: 330 West Broadway
CITY AND ZIP CODE: San Diego, CA 92101
BRANCH NAME: Hall of Justice

| PLAINTIFF/PETITIONER: Platypus Wear, Inc., et al. | CASE NUMBER: 879491 |
|---|---|
| DEFENDANT/RESPONDENT: Horizonte, Ltda., et al. | JUDICIAL OFFICER: |
| **NOTICE OF RELATED CASE** | DEPT.: |

The following case or cases are related to the above-captioned case:

1. a. Title: Platypus Wear, Inc., et al. v. Kevin A. Cahill, et al.

   b. Court: [X] same as above [ ] other *(name and address):*

   c. Case number: GIC 837613

   d. Filing date: October 22, 2004

   e. Relationship to this case: The two cases, GIC 837613 and the instant case, arise out of the same conspiracy to steal the intellectual property of Platypus Wear, Inc.

   f. If the related case is pending in the same court as this case, explain why the assignment of the cases to a single judge is likely to result in efficiencies: There is substantial overlap to the facts underlying each case as well as the witnesses likely to testify at trial in each case.

   [ ] Additional explanation is attached in Attachment 1.

2. a. Title:

   b. Court: [ ] same as above [ ] other *(name and address):*

   c. Case number:

   d. Filing date:

   e. Relationship to this case:

   f. If the related case is pending in the same court as this case, explain why the assignment of the cases to a single judge is likely to result in efficiencies:

   [ ] Additional explanation is attached in Attachment 2.

3. [ ] Additional related cases are described on Attachment 3.

Date: February 2, 2007

Karen B. King, Esq.                                    ▶
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)                (SIGNATURE OF PARTY OR ATTORNEY)

Page 1 of 2

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Michael H. Riney, Esq. (116137)   Karen B. King, Esq. (167568)<br>VANTAGE LAW GROUP, A.P.C.   501 W. Broadway, Ste. 2020<br>600 W. Broadway, Ste. 950   San Diego, CA 92101<br>San Diego, CA 92101   Telephone: (619) 702-2301<br>   Facsimile: (619) 702-2401 | |

TELEPHONE NO.: (619) 330-3000   FAX NO.: (619) 330-3010

ATTORNEY FOR (Name): Plaintiffs Platypus Wear, Inc., et al.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
[X] HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827
[ ] NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92081-6643
[ ] EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941
[ ] RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065-5200
[ ] SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649

CASE NAME: Platypus Wear, Inc., et al v. Horizonte LTDA, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited  [ ] Limited<br>(Amount demanded  (Amount demanded<br>exceeds $25,000)  is $25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 1811) | GIC 879491<br>JUDGE:<br>DEPT.: |

*Items 1–5 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[X] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)

[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)

[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812 )**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is [X] is not complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial post-judgment judicial supervision

3. Type of remedies sought (check all that apply):
   a. [X] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [X] punitive

4. Number of causes of action (specify): Twelve.

5. This case [ ] is [X] is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: February 2, 2007

Karen B. King, Esq.
_____
(TYPE OR PRINT NAME)

▶

_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2006]
SDSC CIV-51 (Rev. 1-06)

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 201.8, 1800-1812;
Standards of Judicial Administration, § 19
SD-CV51

# SUPERIOR COURT OF CALIFORNIA, COUNT OF SAN DIEGO

INDEPENDENT CALENDAR CLERK
330 W. Broadway
San Diego, CA 92101

**TO:**
MICHAEL H RINEY (P)

## FILE COPY

---

| PLATYPUS WEAR INC | | Case No.: GIC879491 |
|---|---|---|
| | Plaintiff(s) | **NOTICE OF CASE ASSIGNMENT** |
| | vs. | |
| HORIZONTE LTDA | | Judge: RICHARD E. L. STRAUSS |
| | Defendant(s) | Department: 75 |
| | | Phone: 619-685-6120 |

---

**COMPLAINT FILED** 02/02/07

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document. (Rule 2.5)

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.) (Rule 2.6)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service. (Rule 2.7)

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING.

ALSO SEE THE ATTACHED NOTICE TO LITIGANTS.

### CERTIFICATE OF SERVICE

I certify that I am not a party to the above-entitled case; on the date shown below, I served this notice on the parties shown by personally handing it to the attorney or their personal representative at     SAN DIEGO California.

DATED: 02/02/07

BY: CLERK OF THE SUPERIOR COURT

SUMMONS
(CITACIÓN JUDICIAL)

SUM-100

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
HORIZONTE LTDA, a Brazilian limited partnership,
FERNANDO MARIA AGOSTINHO PEREIRA CALDAS, JR., an
individual, ROBERTO SILVA RAMOS,  an individual, and
DOES 1-50

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
PLATYPUS WEAR, INC., a Nevada Corporation, PLATYPUS WEAR,
INC., a California Corporation, PW INDUSTRIES, INC., a
California Corporation, and ALEXANDRA PONCE DE LEON, in
her capacities as the Special Administrator of the Estate
of Dr. Franklin F. Offner and as the Trustee of the Sylvia
Caira Descendants' Trust

| | |
|---|---|
| | **FOR COURT USE ONLY** *(SOLO PARA USO DE LA CORTE)* |

**You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.** A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* San Diego Superior Court 330 West Broadway San Diego, California  92101 | CASE NUMBER: *(Número del Caso):* 879491 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Michael H. Riney, Esq. (619) 330-3000
VANTAGE LAW GROUP, A.P.C.
600 West Broadway, Ste. 950
San Diego, California  92101

Karen B. King, Esq.   (619) 702-2301
501 West Broadway, Ste. 2020
San Diego, California 92101

DATE: FEB 0 2 2007                                   Clerk, by _____, Deputy
*(Fecha)*                                            *(Secretario)* C. VAN FEL.         *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:

    under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
           ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:                                    Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Legal
Solutions
⚖ Plus

Code of Civil Procedure §§ 412.20, 465

GE/320.00u

1  Michael H. Riney, Esq. (116137)
   VANTAGE LAW GROUP A.P.C.
2  600 W. Broadway, Suite 950
   San Diego, CA 92101
3  Telephone: (619) 330-3000
   Facsimile:  (619) 330-3010
4
   Karen B. King, Esq. (167568)
5  501 W. Broadway, Suite 2020
   San Diego, CA 92101
6  Telephone: (619) 525-2270
   Facsimile:  (619) 525-2280
7

8  Attorneys for plaintiffs

9           SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                 FOR THE COUNTY OF SAN DIEGO

11 PLATYPUS WEAR, INC., a Nevada          )  Case No.  GIC 879491
   Corporation, PLATYPUS WEAR, INC., a    )
12 California Corporation, PW INDUSTRIES, )
   INC., a California Corporation, and    )  COMPLAINT
13 ALEXANDRA PONCE DE LEON, in her        )
   capacities as the Special Administrator of the )  UNLIMITED CIVIL CASE
14 Estate of Dr. Franklin F. Offner and as the )
   Trustee of the Sylvia Caira Descendants' )
15 Trust,                                  )
                                           )
16           Plaintiffs,                   )
                                           )
17 v.                                      )
                                           )
18 HORIZONTE LTDA, a Brazilian limited     )
   partnership, FERNANDO MARIA            )
19 AGOSTINHO PEREIRA CALDAS, JR., an       )
   individual, ROBERTO SILVA RAMOS,  an   )
20 individual, and DOES 1-50,             )
                                           )
21           Defendants.                   )
                                           )
22 _____)

23

24

25

26

27

28

                          Complaint

Plaintiffs allege:

Overview:

This action for damages and injunctive relief arises out of a conspiracy by Horizonte and certain of its agents to circumvent valid orders of the San Diego County Superior Court and illicitly seize control over PWI's valuable intellectual property via a series of secret and backdated documents.

## THE PARTIES

1.     Plaintiff Platypus Wear, Inc. ("Wear") is a dissolved California Corporation that did business in the County of San Diego.

2.     PW Industries, Inc. was incorporated on or about May 1, 1990 as a wholly owned subsidiary of Wear. PW Industries, Inc. has been dissolved and its assets, including the causes of action that are the subject of this complaint, have been distributed to its sole shareholder, Wear.

3.     In or about June 2006, Wear was dissolved and its assets, including the causes of action that are the subject of this complaint, have been transferred to its successor company, Platypus Wear, Inc., a Nevada Corporation ("Wear Nevada").

4.     Wear, Wear Nevada and PW Industries, Inc. are hereinafter collectively referred to as "PWI."

5.     Plaintiff Alexandra Ponce de Leon is an individual residing in Illinois, is the special administrator of the estate of the late Dr. Franklin F. Offner and is the trustee of the Sylvia Caira Descendants' Trust.

6.     On information and belief, Horizonte Ltda. ("Horizonte") is a Brazilian limited partnership.

7.     On information and belief, Defendant Fernando Maria Agostinho Pereira Caldas, Jr. ("Caldas, Jr.") is a Portuguese citizen, a resident of Brazil and a managing agent of Horizonte.

8.     On information and belief, Defendant Roberto Silva Ramos ("Ramos") is a Brazilian resident and a managing agent of Horizonte.

9.     On information and belief, at all times material hereto, Caldas, Jr. and Ramos were acting within their authority and in pursuit of the business of Horizonte.

## DOE ALLEGATIONS

10.     Plaintiffs are ignorant of the true names and capacities of defendants sued herein as Doe 1 through Doe 50 and, therefore, sue those defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities after they have been ascertained.  Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously named defendants is an agent or representative of each of the named defendants.

11.     Plaintiffs are informed and believe, and thereon allege, that the defendants, and each of them, are the agents of one another, and that all of the acts performed by each and every defendant were within the course and scope of that agency relationship.

## GENERAL ALLEGATIONS

**A.     THE BUSINESS OF PWI.**

12.     PWI has been in business since 1984 and is in the business of licensing the use of its intellectual property in the United States and around the world.

13.     At all relevant times, PWI has been the owner of the following relevant United States copyright registrations.  PWI's copyright registrations are valid and subsisting.

| Design | Reg. No. | Title | First Publication Date and Registration Date |
|---|---|---|---|
|  | VA 734-334 | BAD BOY FACE DESIGN | 1st Pub.: March 30, 1989<br>Reg.: Sept. 27, 1995 |
| Bad Boy | VA 740-282 | BAD BOY CORPORATE DESIGN | 1st Pub.: December 18, 1991<br>Reg.: Sept. 18, 1995 |

| Design | Reg. No. | Title | First Publication Date and Registration Date |
|---|---|---|---|
|  | VA 734-333 | BAD BOY – BOY FIGURE | 1st Pub.: February 1, 1994 Reg.: Sept. 27, 1995 |

(PWI's United States copyright registrations are hereafter individually and collectively referred to at times as the "BAD BOY Copyrights.")

14.     The BAD BOY Copyrights contain material wholly original to PWI that is copyrightable subject matter under the laws of the United States.

15.     Since at least the mid-1980s, PWI or its predecessors-in-interest have been the exclusive owner of United States' common law and statutory trademark rights in the mark BAD BOY, and related design marks.  Indeed, PWI is the owner of the following relevant United States trademark registrations with respect to the BAD BOY brand and its related FACE design trademarks.[1]

| Mark | Reg. No. | Goods / Date of first use in commerce | Filing Date/ Registration Date |
|---|---|---|---|
|  | 3,142,900 | Class 32. Non-alcoholic beverages, namely, carbonated beverages, smoothies, energy drinks, sports drinks, fruit drinks, fruit flavored soft drinks, soft drinks and isotonic drinks. FIRST USE: 20031115. FIRST USE IN COMMERCE: 20060224 | Filed: Nov. 5, 2003 Reg.: Sept. 12, 2006 |

---

[1] PWI owns numerous other BAD BOY and related design marks in the United States and around the world, not specifically detailed herein, which are of relevance to PWI's longstanding rights with respect to the BAD BOY brand and related designs throughout the world.

3

Complaint

| Mark | Reg. No. | Goods / Date of first use in commerce | Filing Date/ Registration Date |
|---|---|---|---|
|  | 2,013,727 | Class 25. Men's, women's and children's clothing, namely, shirts, knit tops, woven tops, pants, shorts, volleyball shorts, hats, swim trunks, T-shirts, tank tops, jackets, sweatshirts, and shoes. FIRST USE: 19890330. FIRST USE IN COMMERCE: 19890330 | Filed: Nov. 17, 1995 Reg.: Nov. 5, 1996 |
|  | 2,060,484 | Class 25. Men's, women's and children's clothing, namely, shirts, knit tops, woven tops, pants, shorts, volleyball shorts, hats, visors, swim trunks, T-shirts, tank tops, jackets, sweatshirts, sweatpants, belts, headbands, wristbands, vests, and shoes. FIRST USE: 19911218. FIRST USE IN COMMERCE: 19911218 | Filed: Sept. 18, 1995 Reg.: May 13, 1997 |
| BAD BOY | 2,045,529 | Class 25. Men's, women's and children's clothing, namely shirts, knit tops, woven tops, pants, shorts, volleyball shorts, hats, visors, swim trunks, T-shirts, tank tops, jackets, sweatshirts, sweatpants, belts, headbands, wristbands, vests, and shoes. FIRST USE: 19820100. FIRST USE IN COMMERCE: 19830100 | Filed: Sept. 18, 1995 Reg.: March 18, 1997 |

4

Complaint

1      16.    At all relevant times, PWI has also been the owner of the following relevant

2  United States trademark applications in the word mark BAD BOY.

| Mark | Ser. No. | Goods | Filing Date/ Registration Date |
|---|---|---|---|
| **BAD BOY** | 78/323357 | Class 32. Non-alcoholic beverages, namely, carbonated beverages, smoothies, energy drinks, sports drinks, fruit drinks, fruit flavored soft drinks, soft drinks and isotonic drinks | Filed: Nov. 5, 2003 |
| **BAD BOY** | 76/037086 | Class 9. Athletic and sporting helmets, namely, baseball helmets, skate boarding helmets, football helmets, catcher's helmets, hockey helmets, bicycle helmets and motorcross helmets. Class 18. Athletic and sporting bags. Class 28. Sporting goods and athletic equipment, etc.[2] | Filed: April 28, 2000 |

      17.    PWI also filed the following trademark applications in various jurisdictions in the world with respect to International Class 5 (beverage products).

////

////

////

////

////

////

---

[2] The list of products in Class 28 is substantially more inclusive and has been shortened for the sake of brevity.

| Mark | Country/ App. No. | Goods | Filing Date/ Registration Date |
|------|-------------------|-------|-------------------------------|
| **BAD BOY** | EU/CTM[3] 002383818 | Class 5. Nutritionally fortified beverages for use as meal replacements and dietary supplements; vitamin and mineral supplements. | Filed: Sept. 21, 2001 |
| **BAD BOY** | Japan 2001-84897 | Class 5. Nutritionally fortified beverages for use as meal replacements and dietary supplements; vitamin and mineral supplements. | Filed: Sept.19, 2001 |
| **BAD BOY** | USA 76/233946 | Class 5. Nutritionally fortified beverages for use as meal replacements and dietary supplements; vitamin and mineral supplements | Filed: March 30, 2001 |

18.     The foregoing applications in the European Union and in the United States were illegally transferred to the recorded ownership of Horizonte pursuant to the conspiracy alleged herein.

19.     All of the foregoing PWI BAD BOY trademark applications and registrations are collectively and individually referred to at times as the "BAD BOY Trademarks."

20.     Over the years, PWI, its predecessors-in-interest and licensees have invested substantial sums of money in the United States and around the world in building the BAD BOY brand and in marketing and promoting the BAD BOY Trademarks and BAD BOY Copyrights and products bearing those trademarks and copyrights.

21.     As a part of the investment in marketing and promotion, PWI contracts for the operation of two websites related to its use of the BAD BOY Trademarks and BAD BOY Copyrights, www.badboybrands.com and www.badboy.com.  PWI's authorized licensees also

---

[3] "EU/CTM" refers to the European Union's Community Trademark Mark.

maintain websites around the globe, including the site www.badboymma.com and www.balzout.com , through which goods bearing the BAD BOY Trademarks and BAD BOY Copyrights are available for purchase over the internet in the United States and elsewhere.

22.     PWI has licensed BAD BOY Power Drinks, LLC, a California Limited Liability Company, in the United States to manufacture, market, sell and distribute energy drinks. PWI's United States licensee is currently selling a product named BAD BOY Power Drink in the United States and has invested substantial sums in the development and marketing of the product. The product, BAD BOY Power Drink, bears the BAD BOY Trademarks and the BAD BOY Copyrights, with authorization from PWI.

23.     Through these longstanding marketing and promotion efforts, and extensive and continuous use, PWI, its predecessors-in-interest and its licensees have generated substantial goodwill associated with the BAD BOY Trademarks and the BAD BOY Copyrights in the United States and around the world.

24.     In addition, PWI has vigorously policed and defended the distinctiveness of the BAD BOY Trademarks and the BAD BOY Copyrights, preserving the unique association between such trademarks and copyrights and PWI.

25.     Through its efforts and those of its licensees, PWI is known as the exclusive source of products legitimately bearing the BAD BOY Trademarks, both as individual trademarks and particularly when the BAD BOY word mark is combined with the FACE design, which carries both copyright and trademark protected status.

26.     The BAD BOY Trademarks are inherently distinctive in connection with the goods for which PWI and/or its licensees use the marks in commerce. In addition, because of the extensive use and promotion of the BAD BOY Trademarks over many years in numerous channels of trade, these marks have acquired distinctiveness within the marketplace.

**B.      THE BUSINESS OF HORIZONTE.**

27.     Horizonte produces and distributes beverages and related products. On information and belief, Horizonte is owned and operated by several partners including Caldas,

Jr., Ramos, Caldas, Jr.'s father, Fernando Caldas Pereira Caldas, Sr., their related entities and other individuals and entities.

28.     Since at least 2001, without a valid license from PWI, Horizonte has sold energy drinks in Brazil and elsewhere packaged in aluminum cans bearing PWI's BAD BOY Trademarks and BAD BOY Copyrights (the "Illicit Cans"[4]).  A true and correct reproduction of one of the Illicit Cans is as follows:



29.     Since at least 2006, also without license from PWI, Horizonte has sold and/or offered for sale energy drinks packaged in the Illicit Cans bearing PWI's BAD BOY Trademarks and BAD BOY Copyrights on its website http://www.badboypowerco.com in the United States and elsewhere throughout the world.

30.     PWI is informed and believes that Horizonte is actively marketing its product in the Illicit Cans to potential distributors for wider distribution in the United States and elsewhere. As alleged on Horizonte's website, "BadBoy Power Co. is an umbrella structure established to coordinate the international expansion of BadBoy Power Drink distribution.  BadBoy Power Drink is expanding from Brazil to the World."

31.     Since at least 2003, Horizonte has caused the manufacture of the Illicit Cans – through a United States can manufacturer – for filling with Horizonte's energy drink product, as

_____

[4] The Illicit Cans are similar in design to the cans used by PWI's authorized licensee, Bad Boy Power Drinks, LLC.  The authentic cans can be distinguished from the Illicit Cans by virtue of the acknowledgment on the authentic can that the distributor is Bad Boy Power Drinks, LLC. Moreover, to plaintiffs' knowledge, aside from use of the brand name BAD BOY and minor notices, none of the text on the Illicit Cans is currently printed in the English language, even though the Illicit Cans are being offered for sale in the United States.

8

Complaint

1   graphically depicted in paragraph 28.  On information and belief, the Illicit Cans are distributed

2   to the United States, Brazil, Panama, other South American regions, and around the world.

3        32.    The Illicit Cans bear PWI's BAD BOY Trademarks or marks confusingly similar

4   thereto.  The Illicit Cans also bear the BAD BOY Copyrights, or virtually identical or derivative

5   works.

6        33.    PWI has not authorized or consented to Horizonte's reproduction, distribution,

7   display or utilization of the BAD BOY Trademarks and/or BAD BOY Copyrights for any

8   purpose on or with respect to the Illicit Cans.  Horizonte's continued use of the BAD BOY

9   Trademarks, or marks confusingly similar thereto, and the BAD BOY Copyrights, or virtually

10  identical or derivative works, falsely represents the origin of Horizonte's products in a manner

11  that is likely to cause confusion, mistake, or deception among the purchasing public.

12       34.    Horizonte, Caldas, Jr. and Ramos have extensive contacts with San Diego County,

13  California, as discussed, *inter alia*, in paragraphs 89, 135 and 160.

14       35.    Horizonte has made numerous applications, either directly or through the use of

15  third parties, for trademark rights that incorporate PWI's Bad Boy Copyright.

16  **C.**     **THE PWI SHAREHOLDER LITIGATION.**

17       36.    The instant action is related to numerous other legal actions filed in San Diego,

18  California and elsewhere.  These actions are discussed at paragraphs 170 through 184.

19       37.    All of the related litigation stems from a series of lawsuits brought in the San

20  Diego Superior Court.  These lawsuits arose from the illicit control of PWI by Laurens Offner

21  ("Laurens"), who previously claimed to be PWI's controlling shareholder.

22       38.    Laurens had usurped control over PWI from Laurens' elderly father, the late Dr.

23  Franklin F. Offner ("Dr. Offner"), PWI's true controlling shareholder.

24       39.    Laurens caused Dr. Offner to loan more than $11,000,000 for the benefit of PWI

25  while Dr. Offner suffered from Alzheimer's disease.  Laurens concealed these loans from his

26  family and his father's caretakers.

27       40.    Laurens and PWI repaid almost none of these loans.

28

41.   Dr. Offner owned a controlling interest of PWI's stock through common and preferred stock positions.

42.   In 1995, while Dr. Offner was incompetent due to Alzheimer's disease, Laurens secretly caused Dr. Offner to purportedly transfer his preferred stock in PWI to Laurens. Although Laurens claimed that he owned the preferred stock as a result of this purported transfer, the purported transfer was invalid.

43.   By concealing his secret transactions with Dr. Offner, Laurens successfully concealed the fact that Dr. Offner owned a controlling interest in PWI's stock and thereby exercised illicit control over PWI for many years.

44.   Dr. Offner died in 1999, at which time the estate of Dr. Franklin F. Offner (the "Estate") became a creditor of PWI.

45.   Dr. Offner's wife, Janine Offner, died in 2000.

46.   Alexandra Ponce de Leon became and is the independent administrator of the Estate.

47.   The Estate and the Sylvia Caira Descendants' Trust (the "Trust") (of which Alexandra Ponce de Leon is trustee) are creditors of PWI.

48.   In or about October 2001, Alexandra Ponce de Leon learned of the extensive secret borrowings from Dr. Offner.

49.   As the Estate's special administrator, Alexandra Ponce de Leon had a duty to marshal the Estate's assets.

50.   In 2002, PWI's shareholders other than Laurens, Alexandra Ponce de Leon, Sylvia Caira, Robin Offner and the Estate, joined various actions brought in the San Diego Superior Court seeking, *inter alia*, to remove Laurens from his illegitimate position of control over PWI and a judicial declaration as to PWI's true ownership (these actions are hereafter referred to collectively as the "Shareholder Litigation").

51.   Early in the Shareholder Litigation, on May 16, 2002, the San Diego Superior Court entered an order enjoining Laurens from transferring PWI's trademarks without a majority

1  vote of PWI's board of directors.  At no time did a majority of PWI's board of directors vote to

2  transfer any of PWI's trademarks or other intellectual property to Horizonte.

3       52.    The Shareholder Litigation was tried to a jury in May and June of 2003.

4       53.    On June 27, 2003, the San Diego Superior Court entered judgment in the

5  Shareholder Litigation, which judgment ruled, *inter alia*:

6            (1)    Laurens embezzled $588,535.00 from PWI;

7            (2)    Clear and convincing evidence established that Laurens committed fraud,

8                    oppression and malice and was liable to PWI for punitive damages in the

9                    amount of $150,000;

10            (3)    Laurens was enjoined from acting on behalf of PWI;

11            (4)    Laurens owned only a minority interest in PWI; and,

12            (5)    The board of directors through which Laurens purported to control PWI

13                    was never validly elected.

14       54.    At all relevant times up to June 27, 2003, Laurens held himself out to be the

15  President and Chief Executive Officer of PWI as well as a PWI director.

16       55.    Laurens was never a lawfully elected director nor a lawfully appointed President

17  or Chief Executive Officer of PWI.

18       56.    After entry of judgment in the Shareholder Litigation, PWI lawfully elected

19  Alexandra Ponce de Leon, Sylvia Caira and Robin Offner as its three directors.  In addition,

20  Robin Offner was appointed Chief Executive Officer and President, roles he maintains to the

21  present.

22  **D.    THE SCHEME TO STEAL PWI'S INTELLECTUAL PROPERTY.**

23       57.    During the Shareholder Litigation, it became clear that Laurens was likely going

24  to lose his illicit control over PWI as a result of an anticipated adverse judgment in the

25  Shareholder Litigation.

26       58.    In the face of his imminent removal from PWI, Laurens created a scheme to

27  transfer PWI's intellectual property to his overseas confederates in order to perpetuate his illicit

28  control over PWI's intellectual property.

59.     In addition, Laurens created schemes to, in his own words, "burn [PWI] to the ground" and put PWI in bankruptcy such that PWI would be insolvent in order to prevent PWI's rightful owners from recovering control over PWI's intellectual property.

60.     As part of his scheme, Laurens intended to enter into transaction on behalf of PWI that would render PWI insolvent.

61.     In the months and years following the entry of judgment in the Shareholder Litigation, PWI learned Laurens had executed his scheme to burn PWI to the ground.

62.     Laurens and his co-conspirators executed a series of backdated documents purporting to effectively transfer to Laurens' co-conspirators PWI's intellectual property rights in Europe, Brazil, Asia, the United States and elsewhere.

63.     Through a series of legal proceedings, PWI has successfully regained control over all of the intellectual property rights that Laurens purported to effectively transfer, with the exception of the intellectual property rights Laurens purported to transfer to Horizonte or its affiliates.

### 1.     The Conspiracy Is Formed.

64.     No later than June 2003, Laurens informed Horizonte that he might lose control over PWI.

65.     No later than June 2003, Laurens, the defendants and others formed an association for the purpose of stripping PWI of certain of its intellectual property rights by purporting to transfer those rights to Horizonte.

66.     Horizonte, Caldas, Jr., Ramos, Laurens and other related individuals conceived, made an agreement to execute, and executed, via various United States mail and wire services, a scheme to transfer to themselves and Laurens the financial and legal benefit of PWI's intellectual property rights so as to perpetuate Laurens' illegal control over PWI's assets after he was removed from PWI by judicial decree.

67.     At the conclusion of the trial in the Shareholder Litigation and some time prior to July 1, 2003, Laurens advised Horizonte that he had been removed from PWI.

////

12

Complaint

1    **2.**     **The Meeting in Miami, Florida.**

2         68.     Approximately two weeks after the entry of the judgment in the Shareholder

3    Litigation, on or about July 12 or 13, 2003, there was a meeting in Miami, Florida (the "Miami

4    Meeting"), which meeting was attended by PWI's former attorney in Brazil, Elisa Santucci,

5    Laurens, Marco Merhej of Big Blue Comèrcio Ltda., PWI's Brazilian licensee, and Ramos.

6    Caldas, Jr. participated by telephone.

7         69.     Big Blue is a Brazilian company with whom PWI has had a licensing relationship

8    since in or about 1992.

9         70.     For many years, Big Blue had filed trademark applications and registrations for

10   PWI's BAD BOY word mark, FACE design and related marks in Big Blue's own name.  Big

11   Blue filed these applications with an express agreement with PWI that all applications would be

12   made only for the benefit of PWI and would be transferred to PWI upon PWI's request.

13        71.     Big Blue filed in its own name the following Brazilian trademark application

14   relevant to this litigation:

| Mark | Brazil App. No. | Goods | Filing Date/ Registration Date |
|---|---|---|---|
| **BAD BOY** | 818746866 | Class 32.  Beverages, syrups and juice concentrates. | Filed: August 28, 1995 |

20        72.     Big Blue had no right to file BAD BOY trademark applications in its own name

21   without assigning those applications to PWI.

22        73.     On July 25, 2002, based upon Big Blue's failure to pay royalties and assign the

23   trademark applications and registrations to PWI, PWI commenced litigation against Big Blue in

24   Federal Court in Brazil (the "*PWI v. Big Blue* action").  On or about February 25, 2003, the

25   Brazilian Federal Court suspended Big Blue's rights to use the trademark applications and/or

26   registrations, by entry of an injunction.

27        74.     At the Miami Meeting, the defendants and others negotiated and/or executed

28   documents that would implement the co-conspirators' scheme to fraudulently transfer certain of

PWI's intellectual property to Horizonte and Big Blue pursuant to the defendants' and Laurens' scheme to strip PWI of such intellectual property.

75.   PWI did not learn about the transactions at the Miami Meeting until in or about November 2005.

**3.   The Fraudulent Backdated Documents.**

    **a.   The United States, European and Japanese Trademark Applications.**

76.   In or about fall of 2002, Horizonte assigned to PWI its application for International Class 5 and International Class 32 in Japan.

77.   Horizonte also at some point assigned to PWI its application for International Class 5 and International Class 32 in the European Community.

78.   Following entry of the judgment in the Shareholder Litigation, Horizonte caused Laurens, purportedly on PWI's behalf, to sign (1) assignments of PWI's BAD BOY trademark applications for the United States and Europe, (2) an assignment of the trademark application in Japan that Horizonte had assigned to PWI as alleged above, and (3) an assignment of the trademark application in the European Community that Horizonte had assigned to PWI as alleged above.  Horizonte and Laurens backdated these documents to indicate an alleged time of execution prior to June 27, 2003, the date that Laurens was removed from his illicit control of PWI.

79.   Horizonte knowingly filed, or caused to be filed, the false, purported backdated and fraudulent assignments with the United States Patent & Trademark Office, the Office for Harmonization in the Internal Market (Trade Marks and Designs), and the trademark division of the Japanese Patent Office.

80.   The false, purported backdated and fraudulent assignment that Horizonte knowingly filed, or caused to be filed, with the United States Patent & Trademark Office is entitled "Trademark Assignment."

81.   The false, purported backdated and fraudulent assignments that Horizonte knowingly filed, or caused to be filed, with the Office for Harmonization in the Internal Market (Trade Marks and Designs) are both entitled "Deed of Assignment."  The first purports to pertain

1 | to Application/Registration Number 002383818.  The second purports to pertain to

2 | Application/Registration Number 002103323.

3 |      82.    The false, purported backdated and fraudulent assignment that Horizonte

4 | knowingly filed, or caused to be filed, with the Japanese Patent Office is entitled "Assignment."

5 |      83.    PWI is informed and believes, and thereon alleges, that Horizonte used, or caused

6 | to be used, the United States wire and/or mail services to transmit the purported backdated

7 | trademark assignments in furtherance of the scheme to steal PWI's intellectual property.

8 |      **b.**    **The "Temporary Assignment Agreement."**

9 |      84.    A document entitled "Temporary Assignment Agreement" purported to govern

10 | the assignment of trademarks between PWI and Horizonte.

11 |      85.    The "Temporary Assignment Agreement" was signed by Laurens (purportedly on

12 | behalf of PWI) and by Caldas, Jr., Ramos and another partner of Horizonte, Frederico De

13 | Carvalho Marques D'Orey Menano.

14 |      86.    The "Temporary Assignment Agreement" purported to be signed on June 20,

15 | 2002.

16 |      87.    However, the "Temporary Assignment Agreement" was not signed in June 2002.

17 |      88.    At or about the time of the trial in the Shareholder Litigation (June 2003), Ramos

18 | flew to San Diego, California and prepared the "Temporary Assignment Agreement."

19 |      89.    PWI only recently learned that Ramos created the backdated and fraudulent

20 | "Temporary Assignment Agreement" in San Diego in or about June 2003.

21 |      90.    Horizonte sued PWI in Brazil to enforce the backdated "Temporary Assignment

22 | Agreement."

23 |      91.    Horizonte falsely represented to the San Diego Superior Court that the

24 | "Temporary Assignment Agreement" was signed on June 20, 2002.

25 |      92.    Horizonte attempted to use the backdated "Temporary Assignment Agreement" as

26 | a basis to gain financial benefits from PWI.

27

28

93.     Horizonte, Caldas Jr. and Ramos used the United States wire and/or mail services to transmit the "Temporary Assignment Agreement" in furtherance of the scheme to steal PWI's intellectual property.

c.     **The Backdated Big Blue Settlement Agreement.**

94.     At or about the time of the Miami Meeting, Santucci prepared a backdated settlement agreement between Big Blue and PWI purporting to settle the *PWI v. Big Blue* action (the "Backdated Big Blue Settlement Agreement"), again bearing a date prior to Laurens' removal from his illicit control.

95.     At the Miami Meeting, Marco Merhej of Big Blue was instructed by Laurens and/or Horizonte that Big Blue would receive the Backdated Big Blue Settlement Agreement under certain conditions, which conditions included the requirement that Big Blue transfer to Horizonte Big Blue's trademark applications for the BAD BOY brand related to products in International Class 5 and International Class 32 (related to beverage products) in Brazil.

96.     Laurens and Horizonte required Big Blue to assign those applications to Horizonte in order to receive the trademark applications and/or registrations that the Brazilian Federal Court had suspended Big Blue from using.

97.     Pursuant to the Backdated Big Blue Settlement Agreement, Big Blue purportedly was permitted to retain all trademark registrations and applications originally registered or filed in its name and Laurens purported to waive millions of dollars of royalties due to PWI.

98.     In exchange for receiving the Backdated Big Blue Settlement Agreement, Big Blue assigned to Horizonte the applications related to products in International Class 5 and International Class 32 in Brazil.

99.     PWI did not learn about this transaction until in or about November 2005.

d.     **The Big Blue/Horizonte Trademark Transfer Agreement.**

100.     As alleged above, at the Miami Meeting, it was agreed among Laurens, Horizonte and Big Blue, that Big Blue would be required to transfer to Horizonte the trademark applications related to products in International Class 5 and International Class 32 in Brazil as a

16

Complaint

1  condition to Big Blue's receiving PWI's intellectual property pursuant to the Backdated Big Blue

2  Settlement Agreement (the "Big Blue/Horizonte Trademark Transfer Agreement").

3       101.   Pursuant to the terms of PWI's agreements with Big Blue, the International Class

4  5 and International Class 32 Brazilian applications actually belonged to PWI, although they were

5  filed in the name of Big Blue.

6       102.   At the time the Big Blue/Horizonte Trademark Transfer Agreement was made, the

7  order of the Brazilian Federal Court suspending all rights on applications and/or registrations in

8  the name of Big Blue remained in full force.

9       103.   The document reflecting the Big Blue/Horizonte Trademark Transfer Agreement

10  was dated but not signed in May 2003. A revised version of this agreement was subsequently

11  signed sometime after the Miami Meeting.

12       104.   On information and belief, the Brazilian International Class 5 application and/or

13  the International Class 32 application registered in Horizonte's name in early 2006.

14          **e.    The Big Blue/Laurens Profit Sharing Agreement.**

15       105.   Also at the Miami Meeting, Big Blue and Laurens signed a document by which it

16  was agreed that Laurens would receive fifty percent (50%) of Big Blue's profits from the future

17  use of certain intellectual property that belonged to PWI and was the subject of the Brazilian

18  Federal Court's injunction (the "Big Blue/Laurens Profit Sharing Agreement").

19       106.   Horizonte, Caldas, Jr., Ramos and other related individuals participated in the

20  negotiation and execution of the Big Blue/Laurens Profit Sharing Agreement.

21       107.   Horizonte and Laurens refused to provide a copy of the Big Blue/Laurens Profit

22  Sharing Agreement to Big Blue at the Miami Meeting.

23       108.   PWI did not learn of the Big Blue/Laurens Profit Sharing Agreement until

24  November 2005.

25          **f.    The Laurens Veto Agreement.**

26       109.   Also at the Miami Meeting, Marco Merhej of Big Blue and Ramos signed a

27  document, the terms of which purported to grant to Laurens veto control over the BAD BOY

28  brand and certain intellectual property that belonged to PWI and were the subject of the Brazilian

1    Federal Court's injunction (the "Laurens Veto Agreement").  Caldas, Jr. subsequently signed the

2    Laurens Veto Agreement.

3         110.    The Laurens Veto Agreement constituted a business arrangement, deal or

4    transaction with Laurens, individually.

5         111.    The intended effect of the Laurens Veto Agreement was to give Laurens,

6    individually, control over the BAD BOY brand.

7         112.    Following the Miami Meeting, Ramos transported to Sao Paulo some of the

8    above-referenced documents, including the Big Blue/Laurens Profit Sharing Agreement and the

9    Laurens Veto Agreement.  In Brazil, Ramos caused Nair Martinez of Big Blue to sign the Big

10   Blue/Laurens Profit Sharing Agreement.  Ramos continued to refuse to provide a copy of the Big

11   Blue/Laurens Profit Sharing Agreement to Nair Martinez, who secretly made a copy of the

12   agreement.

13        113.    Despite execution of the Laurens Veto Agreement, in furtherance of the scheme to

14   strip away PWI's trademarks, Caldas, Jr. filed with the San Diego Superior Court a false

15   declaration dated January 16, 2004 stating: "Horizonte has never engaged in any separate

16   business arrangements, deals or transactions with Laurens Offner as an individual."

17        114.    Using the United States wire and/or mail services, Caldas, Jr. caused his false

18   declaration to be faxed or mailed to a location in the United States in furtherance of the scheme

19   to steal PWI's intellectual property.

20   **E.    HORIZONTE AFFIRMATIVELY CONCEALS ITS MISCONDUCT FROM PWI.**

21        115.    In June 2003, Laurens was judicially removed from PWI through the entry of

22   judgment in the Shareholder Litigation and Robin Offner was appointed PWI's Chief Executive

23   Officer and President.

24        116.    In or about November 2003, PWI learned that Horizonte was seeking to use

25   PWI's intellectual property in Mexico in conjunction with the sale of BAD BOY branded

26   products.

27        117.    Beginning in or about February 2004, Robin Offner and Caldas, Jr. began

28   communicating.  Throughout their initial contact, Caldas, Jr. actively concealed from Robin

18
Complaint

1   Offner the existence of the above-described illicit agreements involving PWI's intellectual

2   property over which Horizonte was claiming control.

3       118.   For example, on or about February 2004, Caldas, Jr. stated to Robin Offner, in

4   writing, "Horizonte signed an agreement with Platypus [PWI] in 2002 with the objective of

5   speeding and enlarging its own business.  That agreement was duly executed by both companies.

6   Since the purpose of the agreement was not achieved, Horizonte enforced the provisions

7   covering the non-compliance of the agreement."

8       119.   Caldas, Jr. was referring to the "Temporary Assignment Agreement," which had

9   not actually been signed until June 2003 at the earliest.

10       120.   On or about February 19, 2004, Robin Offner requested that Caldas, Jr. explain to

11   what Caldas, Jr. was referring when he claimed that Horizonte enforced the written agreement:

12         You also reference that when terms of the agreement between our
companies "wasn't met by Platypus, we enforced the provisions covering

13   the non-compliance of the agreement by the parties."  Please advise me in
what way you did not meet the clauses in the agreement and in what

14   way you enforced the provisions covering the noncompliance.

15       121.   Caldas, Jr. did not respond to Robin Offner's February 19, 2004 request for

16   information.

17       122.   In fact, Caldas, Jr. was referring to the fact that Horizonte and Laurens had

18   executed purported backdated trademark assignments and filed those purported assignments with

19   various government agencies.

20       123.   Caldas, Jr. concealed from PWI that Horizonte had acquired the purported

21   backdated trademark assignments from Laurens.

22       124.   As of February 19, 2004, PWI and Alexandra Ponce de Leon had no knowledge

23   or information that Horizonte had acquired purported backdated trademark assignments from

24   Laurens.

25       125.   After June 27, 2003 and prior to February 2004, PWI had learned that Laurens

26   had assisted Horizonte in applying for certain trademark rights in the BAD BOY brand in

27   Mexico.

28

126.     After February 19, 2004, PWI caused its attorneys to obtain copies of the official trademark files from the Japanese and United States trademark offices and the Office for Harmonization in the Internal Market (Trade Marks and Designs) for the purported trademark applications held in the name of Horizonte.

127.     PWI learned for the first time in the latter half of March 2004 that Horizonte had obtained purported backdated trademark assignments from Laurens for Japan, the European Community and the United States.

128.     Robin Offner then met with Caldas, Jr. and Ramos for the first time in Sao Paulo, Brazil in or about August 2004.

129.     In or about September 2004, Robin Offner met with Horizonte and its agents in Lisbon, Portugal.  During the meeting, Horizonte affirmatively sought to convince PWI, and did convince PWI, that Horizonte was not involved in any illicit transactions.

130.     During the September 2004 meeting in Lisbon, Horizonte repeatedly acknowledged to PWI that PWI owned all intellectual property rights related to the BAD BOY brand.

131.     During and after the September 2004 meeting, Horizonte claimed that it was the victim of deception by Laurens and Big Blue.

132.     Specifically, Horizonte claimed that it was informed by Big Blue that Big Blue was the lawful owner of all intellectual property rights in Brazil related to the BAD BOY brand.

133.     Horizonte also claimed that it purchased from Big Blue the Brazilian trademark applications for International Classes 5 and 32 in Brazil in or about 2001 or 2002, a time that, according to Horizonte, was prior to Horizonte learning of PWI's right to the trademarks.

134.     Subsequently, Caldas, Jr. gained a position of trust with PWI and Robin Offner.

135.     Over several different periods of time occurring between on or about October 2004 and on or about November 2005, Horizonte (by Caldas, Jr.) operated aspects of its business out of PWI's San Diego office suite.  During these periods, Caldas, Jr. enjoyed the use of his own furnished office, utilized the services of PWI's support staff, lived in Robin Offner's home and

1   had full access to such items as Robin Offner's vehicle. In addition, Caldas, Jr. arranged for PWI

2   to provide a cell phone for his use.

3       136.   On or about October 2004 through on or about November 2005, Horizonte

4   represented to Robin Offner that, prior to entry of judgment in the Shareholder Litigation,

5   Laurens and Horizonte had agreed to negotiate a joint venture in which Horizonte and PWI

6   would jointly own the International Class 5 and 32 trademarks throughout the world.

7       137.   After entry of judgment in the Shareholder Litigation, PWI (acting through Robin

8   Offner) agreed to work with Horizonte towards a deal consistent with the deal Laurens had

9   purportedly been negotiating with Horizonte.

10       138.   PWI and Robin Offner later learned that Horizonte's claim that it had agreed with

11   Laurens to a joint venture in which Horizonte and PWI would jointly own the above-described

12   intellectual property was false.

13       139.   At the time Horizonte represented to Robin Offner that, prior to entry of judgment

14   in the Shareholder Litigation, Laurens and Horizonte had agreed to negotiate a joint venture in

15   which Horizonte and PWI would jointly own the International Class 5 and 32 trademarks

16   throughout the world, on information and belief, Horizonte was in possession of documents

17   reflecting the fact that the deal that Laurens and Horizonte had contemplated expressly

18   acknowledged that PWI - and only PWI - would have exclusive worldwide right, title and

19   interest in and to the intellectual property that was the subject of the contemplated deal.

20       140.   Caldas, Jr. affirmatively misrepresented to PWI what had occurred at the Miami

21   Meeting. Between September 2004 and January 2006, Caldas, Jr. represented to PWI that

22   Horizonte did meet with Laurens in Miami in July 2003, but that the sole purpose of that meeting

23   was to request of Laurens that Laurens put Horizonte into contact with a PWI associate, Sean

24   "Puff Daddy" Combs. Laurens, in turn, claimed that he had been merely vacationing in Miami

25   in July 2003.

26       141.   Between on or about January 2004 and on or about January 2006, Horizonte

27   actively concealed from PWI, and lied about the existence of, the written documents reflecting

28

21
Complaint

1  Horizonte's acknowledgment that PWI would own the relevant trademark registrations pursuant

2  to the joint venture Horizonte had been negotiating with Laurens.

3       142.   Between on or about October 2004 and on or about November 2005, Horizonte

4  also affirmatively sought to convince, and did convince, PWI that Horizonte was not involved in

5  the backdating of any documents.

6  **F.    PWI LEARNS OF THE DEFENDANTS' SCHEME.**

7       143.   PWI learned in or about November 2005 that Horizonte's statement as to how it

8  purported to acquire the International Class 5 and Class 32 trademark applications in Brazil was

9  false.

10       144.   In or about November 2005, Big Blue's principal, Nair Afonso Martinez, admitted

11  to Robin Offner that Big Blue, Horizonte and Laurens had engaged in a conspiracy to steal

12  PWI's intellectual property through a series of backdated documents.

13       145.   In or about November 2005, Nair Afonso Martinez disclosed the details of the

14  Miami Meeting to PWI and provided PWI with copies of the Laurens Veto Agreement and the

15  Big Blue/Laurens Profit Sharing Agreement.

16       146.   After learning the newly revealed facts about Horizonte's misconduct, Robin

17  Offner confronted Caldas, Jr. about how Horizonte truly acquired the International Class 5 and

18  32 trademarks in Brazil.

19       147.   Caldas, Jr. responded by presenting Robin Offner with a document written

20  entirely in Portuguese that was dated July 20, 2002 and entitled "Instumento Particular De

21  Contrato De Licença De Uso De Pedidos De Registro De Marcas E Logomarca Para A

22  Fabricação, Venda E Distribuição De Produtos" (hereafter "Instrumento").

23       148.   Caldas, Jr. claimed to Robin Offner that the Instrumento was actually an

24  agreement for the transfer of ownership of International Class 5 and 32 trademarks in Brazil to

25  Horizonte from Big Blue.

26       149.   Robin Offner asked Caldas, Jr. to specifically identify the clause in the document

27  that purported to transfer the ownership of International Class 5 and 32 trademarks in Brazil.  In

28

1   response, Caldas, Jr. pointed to a clause written in Portuguese which clause in fact discussed the

2   payment of royalties.

3       150.    In fact, the Instrumento did not purport to transfer ownership of the International

4   Class 5 and 32 trademarks in Brazil to Horizonte.  Rather, an English translation of the document

5   expressly states, "This agreement or any act related to it, does not grant, does not intend to grant,

6   nor can be used as a motive for the granting of any rights to the LICENSEE over the

7   TRADEMARKS and/or the production and/or commercialization of the PRODUCTS."

8       151.    Robin Offner also confronted Caldas, Jr. about the Laurens Veto Agreement.

9       152.    Caldas, Jr. adamantly denied signing the Laurens Veto Agreement.  In response to

10  Caldas, Jr.'s denial, PWI arranged to hire a forensic questioned document examiner to confirm

11  whether Caldas, Jr. had in fact signed the Laurens Veto Agreement.

12      153.    After Caldas, Jr. was told that PWI had arranged for a questioned document

13  examiner to examine Caldas, Jr.'s signature, Caldas, Jr. and Horizonte admitted that the signature

14  was Caldas, Jr.'s.

15      154.    In or about December 2005, Laurens admitted to PWI that he and Horizonte had

16  backdated the purported agreements.

17      155.    After discovering Caldas, Jr.'s involvement in the backdating of documents, and

18  his lies about such backdating, PWI stopped dealing with Caldas, Jr.

19      156.    Throughout his dealings with PWI, Caldas, Jr. had represented to PWI that all of

20  Horizonte's partners had to be informed, were informed and participated in the decision-making

21  process on behalf of Horizonte.

22      157.    Caldas, Jr. had also represented to PWI that Caldas, Jr.'s father, Fernando Caldas

23  Pereira Caldas, Sr. ("Caldas, Sr.") and  Antonio Manuel Pereira Caldas Castro Henriques

24  ("Henriques"), in particular, were involved in all of Horizonte's significant decisions.

25      158.    Caldas, Jr. also had referred to Henriques as the "most important partner" whose

26  assent was required for all significant decisions.

27      159.    Henriques has testified under oath, in effect, that he does not believe that

28  Horizonte owns the relevant trademarks.

160.   On or about December 28, 2005, Caldas, Sr. traveled to San Diego to meet with PWI concerning the allegations of backdating.

161.   Caldas, Sr. represented to PWI that he controlled Horizonte and that Horizonte's other partners would do whatever Caldas, Sr. told them to do.

162.   After the December 2005 meeting, Caldas, Sr. asked that Robin Offner travel to Portugal for the express purpose of setting forth the evidence of backdating for the partners of Horizonte.

163.   In or about January 2006, Robin Offner and PWI's other directors, Alexandra Ponce de Leon and Sylvia Caira, traveled to Lisbon and met with Horizonte's partners, including Caldas, Jr. and Caldas, Sr.

164.   As requested by Caldas Sr., Robin Offner set forth the evidence of backdating for Horizonte's partners.

165.   After Robin Offner's presentation of the evidence of backdating, and during the Lisbon meeting in or about January 2006, Caldas, Jr. admitted to PWI that the documents were backdated.

166.   In or about January 2006, Caldas, Jr. first admitted to PWI that the Miami Meeting involved the illicit backdating of documents purporting to transfer PWI's intellectual property rights.

167.   In the same meeting in Lisbon, Caldas, Jr. admitted that: (1) he caused the various backdated documents to be filed with governmental agencies and courts; (2) the Miami Meeting had in fact occurred; and, (3) he had lied to PWI about the true facts.  Caldas, Jr. also purported to apologize for having lied.

168.   Subsequently, PWI demanded the return of its trademark applications and registrations from Horizonte.

169.   Although Horizonte had admitted that the trademarks were acquired via fraudulent backdated documents and that the trademark applications and registrations properly belonged to PWI, Horizonte demanded monetary concessions from PWI for the return of the stolen intellectual property.

**G.     OTHER ACTIONS RELATED TO THE INSTANT ACTION.**

170.    There are several other actions related to the instant action.

171.    While the Shareholder Litigation was pending, Alexandra Ponce de Leon, in her capacity as the special administrator of the Estate brought actions in the United States District Court for the Northern District of Illinois (Eastern Division) seeking to recoup some of the approximately $11,000,000 in loans that Laurens had secured from Dr. Offner while Dr. Offner descended into Alzheimer's disease.

172.    The Shareholder Litigation involved numerous post-trial proceedings, including one proceeding to which Horizonte was a party.

173.    On or about June 18, 2004, the San Diego Superior Court issued an order to show cause re contempt and other relief, which order required Horizonte to show cause as to why it should not be adjudged in contempt of court and punished accordingly.

174.    Horizonte caused PWI to voluntarily dismiss Horizonte from this show-cause proceeding, without prejudice, through the series of misrepresentations discussed above.

175.    On or about April 29, 2005, the San Diego Superior Court accepted ten stipulated findings of contempt against Laurens, which findings included admissions to the following misconduct:

(1)     Purporting to transfer PWI's BAD BOY trademark rights to PWI's licensee Big Blue in violation of the Court's May 16, 2002 order;

(2)     Purporting to transfer PWI's BAD BOY trademark rights in Europe to Horizonte in violation of the May 16, 2002 order; and,

(3)     Purporting to transfer PWI's BAD BOY trademark rights in the United States to Horizonte in violation of the May 16, 2002 order.

176.    On or about April 29, 2005, the San Diego Superior Court entered a judgment adjudging Laurens to be in contempt of court.

177.    Presently pending in the San Diego Superior Court is case number GIC 837613, entitled *Platypus Wear, Inc., et al. v. Kevin A. Cahill, et al.*, in which PWI is seeking damages for the conspiracy orchestrated by Laurens in which Horizonte and its related agents participated.

178.   PWI has filed two actions in Brazil against Horizonte related to trademark and copyright infringement by Horizonte in Brazil.

179.   PWI has filed an action in Brazil to invalidate the Brazilian International Class 5 and International Class 32 trademark rights based upon, *inter alia*, the facts that (1) PWI owns a trademark application which predates the trademark filings made by Big Blue and purportedly transferred to Horizonte, (2) the transfer by Big Blue was made in violation of a Brazilian court order, and (3) the illegally transferred trademark rights also incorporate PWI's copyrights without PWI's authorization.

180.   PWI has filed an action in the United States District Court for the Southern District of Florida against some of Horizonte's partners and PWI's former attorneys in Brazil. Caldas, Jr. and Ramos are named defendants in this action, however, PWI has been unable to effectuate service of process upon them.

181.   On or about September 9, 2004, PWI filed a nullity action before the Mexican Institute of Industrial Property ("IMPI") against the trademark registration No. 822167 BAD BOY POWER DRINK (& DESIGN), filed by Horizonte.  This registration incorporates PWI's protected FACE design copyright as part of the trademark.

182.   In or about May 2005, IMPI declared Horizonte's registration null and void on the basis of PWI's FACE design copyright.  Horizonte has appealed that decision, which appeal is still pending.

183.   On or about May 24, 2006, PWI opposed in the United States Patent & Trademark Office trademark application number 76/380011 for BAD BOY POWER DRINK (& DESIGN), filed by Horizonte on March 8, 2002.  This application also incorporates PWI's FACE design copyright.  In response to this action, Horizonte has cross-claimed to cancel PWI's United Status registration for the FACE design in Internacional Class 32.

184.   In addition, PWI filed an infringement action against Horizonte's former can supplier, Ball Metal Beverage Container Corporation ("Ball") in the United States District Court for the District of Colorado.  That case has been settled with an agreement by Ball to no longer produce infringing cans.

Complaint

1

**FIRST CAUSE OF ACTION**

2

**DECLARATORY RELIEF – ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

3          185.    Plaintiffs incorporate by reference paragraphs 1 through 184 above.

4          186.    Plaintiffs contend that the document entitled "Trademark Assignment" that was

5   filed with the United States Patent and Trademark Office is invalid and unenforceable because,

6   *inter alia*:  (1) it was signed in direct violation of the San Diego Superior Court's judgment in the

7   Shareholder Litigation; (2) it was signed by Laurens at a time that Laurens lacked any authority

8   to bind PWI to such assignment; (3) it was signed by Laurens at a time that Horizonte, Caldas, Jr.

9   and Ramos knew or had reason to know that Laurens lacked  authority to bind PWI to such

10  assignment; and (4) Horizonte, Caldas, Jr. and Ramos concealed from PWI the circumstances of

11  the signing of the purported assignment; and, (5) there was a failure of consideration for the

12  purported assignment.

13         187.    Plaintiffs are informed and believe and based thereon allege that Horizonte,

14  Caldas, Jr. and Ramos contend that the document entitled "Trademark Assignment" is valid.

15         188.    An actual controversy has arisen and now exists between plaintiffs and Horizonte,

16  Caldas, Jr. and Ramos concerning their respective rights with respect to the purported

17  assignment.

18         189.    Plaintiffs desire a judicial determination of the parties' respective rights and duties

19  with respect to the purported assignment.

20         190.    A judicial determination is necessary and appropriate at this time under the

21  circumstances in order that the parties may determine their respective rights and duties with

22  respect to the purported assignment.  The unsettled state of affairs with respect to the validity of

23  the purported assignment has and will continue to prejudice the rights of plaintiffs.

24

**SECOND CAUSE OF ACTION**

25

**DECLARATORY RELIEF – ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

26         191.    Plaintiffs incorporate by reference paragraphs 1 through 184 above.

27         192.    Plaintiffs contend that the document entitled "Deed of Assignment" pertaining to

28  Application/Registration Number 002383818 that was filed with the Office for Harmonization in

the Internal Market (Trade Marks and Designs) is invalid and unenforceable because, *inter alia*:
(1) it was signed in direct violation of the San Diego Superior Court's judgment in the
Shareholder Litigation; (2) it was signed by Laurens at a time that Laurens lacked any authority
to bind PWI to such assignment; (3) it was signed by Laurens at a time that Horizonte, Caldas, Jr.
and Ramos knew or had reason to know that Laurens lacked authority to bind PWI to such
assignment; and (4) Horizonte, Caldas, Jr. and Ramos concealed from PWI the circumstances of
the signing of the purported assignment; and, (5) there was a failure of consideration for the
purported assignment.

193.    Plaintiffs are informed and believe and based thereon allege that Horizonte,
Caldas, Jr. and Ramos contend that the document entitled "Deed of Assignment" pertaining to
Application/Registration Number 002383818 is valid.

194.    An actual controversy has arisen and now exists between plaintiffs and Horizonte,
Caldas, Jr. and Ramos concerning their respective rights with respect to the purported
assignment.

195.    Plaintiffs desire a judicial determination of the parties' respective rights and duties
with respect to the purported assignment.

196.    A judicial determination is necessary and appropriate at this time under the
circumstances in order that the parties may determine their respective rights and duties with
respect to the purported assignment. The unsettled state of affairs with respect to the validity of
the purported assignment has and will continue to prejudice the rights of plaintiffs.

### THIRD CAUSE OF ACTION

### DECLARATORY RELIEF – ALL PLAINTIFFS AGAINST ALL DEFENDANTS

197.    Plaintiffs incorporate by reference paragraphs 1 through 184 above.

198.    Plaintiffs contend that the document entitled "Deed of Assignment" pertaining to
Application/Registration Number 002103323 that was filed with the Office for Harmonization in
the Internal Market (Trade Marks and Designs) is invalid and unenforceable because, *inter alia*:
(1) it was signed in direct violation of the San Diego Superior Court's judgment in the
Shareholder Litigation; (2) it was signed by Laurens at a time that Laurens lacked any authority

Complaint

1   to bind PWI to such assignment; (3) it was signed by Laurens at a time that Horizonte, Caldas, Jr.

2   and Ramos knew or had reason to know that Laurens lacked authority to bind PWI to such

3   assignment; and (4) Horizonte, Caldas, Jr. and Ramos concealed from PWI the circumstances of

4   the signing of the purported assignment; and, (5) there was a failure of consideration for the

5   purported assignment.

6        199.   Plaintiffs are informed and believe and based thereon allege that Horizonte,

7   Caldas, Jr. and Ramos contend that the document entitled "Deed of Assignment" pertaining to

8   Application/Registration Number 002103323 is valid.

9        200.   An actual controversy has arisen and now exists between plaintiffs and Horizonte,

10  Caldas, Jr. and Ramos concerning their respective rights with respect to the purported

11  assignment.

12       201.   Plaintiffs desire a judicial determination of the parties' respective rights and duties

13  with respect to the purported assignment.

14       202.   A judicial determination is necessary and appropriate at this time under the

15  circumstances in order that the parties may determine their respective rights and duties with

16  respect to the purported assignment.  The unsettled state of affairs with respect to the validity of

17  the purported assignment has and will continue to prejudice the rights of plaintiffs.

18                          **FOURTH CAUSE OF ACTION**

19       **DECLARATORY RELIEF – ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

20       203.   Plaintiffs incorporate by reference paragraphs 1 through 184 above.

21       204.   Plaintiffs contend that the document entitled "Assignment" that was filed with the

22  Japanese Patent Office is invalid and unenforceable because, *inter alia*:  (1) it was signed in

23  direct violation of the San Diego Superior Court's judgment in the Shareholder Litigation; (2) it

24  was signed by Laurens at a time that Laurens lacked any authority to bind PWI to such

25  assignment; (3) it was signed by Laurens at a time that Horizonte, Caldas, Jr. and Ramos knew or

26  had reason to know that Laurens lacked authority to bind PWI to such assignment; and (4)

27  Horizonte, Caldas, Jr. and Ramos concealed from PWI the circumstances of the signing of the

28  purported assignment; and, (5) there was a failure of consideration for the purported assignment.

1    205.   Plaintiffs are informed and believe and based thereon allege that Horizonte,

2    Caldas, Jr. and Ramos contend that the document entitled "Assignment" is valid.

3    206.   An actual controversy has arisen and now exists between plaintiffs and Horizonte,

4    Caldas, Jr. and Ramos concerning their respective rights with respect to the purported

5    assignment.

6    207.   Plaintiffs desire a judicial determination of the parties' respective rights and duties

7    with respect to the purported assignment.

8    208.   A judicial determination is necessary and appropriate at this time under the

9    circumstances in order that the parties may determine their respective rights and duties with

10   respect to the purported assignment.  The unsettled state of affairs with respect to the validity of

11   the purported assignment has and will continue to prejudice the rights of plaintiffs.

12                          **FIFTH CAUSE OF ACTION**

13       **DECLARATORY RELIEF – ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

14   209.   Plaintiffs incorporate by reference paragraphs 1 through 184 above.

15   210.   Plaintiffs contend that the Big Blue/Horizonte Trademark Transfer Agreement is

16   invalid and unenforceable because, *inter alia*, Laurens released the trademarks into the control of

17   Big Blue with the instruction that Big Blue transfer them to Horizonte at a time that: (1) Laurens

18   lacked any authority to release the trademarks; (2) Horizonte, Caldas, Jr. and Ramos knew or had

19   reason to know that Laurens had no authority to release the trademarks; and (4) Horizonte,

20   Caldas, Jr. and Ramos concealed from PWI the circumstances giving rise to the Big

21   Blue/Horizonte Trademark Transfer Agreement.

22   211.   Plaintiffs are informed and believe and based thereon allege that Horizonte,

23   Caldas, Jr. and Ramos contend that the document entitled Big Blue/Horizonte Trademark

24   Transfer Agreement is valid.

25   212.   An actual controversy has arisen and now exists between plaintiffs and Horizonte,

26   Caldas, Jr. and Ramos concerning their respective rights with respect to the purported agreement.

27   213.   Plaintiffs desire a judicial determination of the parties' respective rights and duties

28   with respect to the purported agreement.

214.  A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may determine their respective rights and duties with respect to the purported agreement.  The unsettled state of affairs with respect to the validity of the purported agreement has and will continue to prejudice the rights of plaintiffs.

## SIXTH CAUSE OF ACTION

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY – PWI AGAINST ALL DEFENDANTS

215.  Plaintiffs incorporate by reference paragraphs 1 through 184 above.

216.  As a person purporting to act as an officer and director of PWI, Laurens owed to PWI the duties of a fiduciary or is estopped from denying he owed to PWI the duties of a fiduciary.

217.  By his conduct as alleged above, Laurens breached his fiduciary duty to PWI.

218.  Horizonte, Caldas, Jr. and Ramos each aided and abetted Laurens' breaches of his fiduciary duty to PWI.

219.  By aiding and abetting Laurens' breaches of fiduciary duty, Horizonte, Caldas, Jr. and Ramos caused damage to PWI.

220.  The above-described conduct of Horizonte, Caldas, Jr. and Ramos was oppressive, malicious and fraudulent, and was intended to cause injury to PWI.  Horizonte, Caldas, Jr. and Ramos are therefore liable for exemplary or punitive damages.

## SEVENTH CAUSE OF ACTION

## FRAUDULENT CONVEYANCE – THE ESTATE AND THE TRUST AGAINST ALL DEFENDANTS

221.  Plaintiffs incorporate by reference paragraphs 1 through 184 above.

222.  The Estate and the Trust are creditors of PWI.

223.  Laurens made the transfer of the trademark registrations to Horizonte with actual intent to defraud any creditor of PWI.

224.  PWI did not receive a reasonably equivalent value in exchange for the transfer of the trademark registrations to Horizonte.

225.   By the conduct alleged herein, Laurens intended to make PWI insolvent by transferring away all of its assets such that PWI would incur debts beyond its ability to pay as they became due.

226.   On information and belief, the defendants and each of them made the purported transfers with an actual intent to hinder, delay and defraud PWI's creditors.

227.   On information and belief, by his fraudulent course of conduct, Laurens intended that PWI would incur debts beyond its ability to pay the debts as they came due.

228.   The above-described conduct of Horizonte, Caldas, Jr. and Ramos was oppressive, malicious and fraudulent, and was intended to cause injury to PWI, the Estate and the Trust.  Horizonte, Caldas, Jr. and Ramos are therefore liable for exemplary or punitive damages.

229.   The Estate and the Trust have suffered and are suffering irreparable harm as a result of the aforementioned fraudulent conveyances and are entitled to avoidance of the purported conveyances and an order enjoining the defendants from exercising or purporting to exercise any rights under the purported backdated, fraudulent agreements and assignments.

### EIGHTH CAUSE OF ACTION

### CONVERSION – PWI AGAINST ALL DEFENDANTS

230.   Plaintiffs incorporate by reference paragraphs 1 through 184 above.

231.   At all relevant times, PWI has been the owner of, and had a right to possession of, the BAD BOY Trademarks and the BAD BOY Copyrights.

232.   At all relevant times, the defendants have known that PWI is the owner of the BAD BOY Trademarks and the BAD BOY Copyrights.

233.   Notwithstanding Horizonte, Caldas, Jr. and Ramos' actual knowledge of PWI's intellectual property rights as alleged herein, defendant Horizonte and defendants Caldas, Jr. and Ramos, acting as agents for Horizonte within the authority and in pursuit of the partnership business, have wrongfully converted to their own unauthorized use PWI's intellectual property.

234.   PWI has demanded that the defendants cease the use of PWI's intellectual property.

235.   The defendants have refused.

1    236.    PWI has been damaged as a direct and proximate result of the defendants' tortious

2    conversion of PWI's intellectual property, as set forth above.

3    237.    The above-described conduct of Horizonte, Caldas, Jr. and Ramos was

4    oppressive, malicious and fraudulent, and was intended to cause injury to PWI.  Horizonte,

5    Caldas, Jr. and Ramos are therefore liable for exemplary or punitive damages.

6                          **NINTH CAUSE OF ACTION**

7           **CONSTRUCTIVE TRUST – PWI AGAINST ALL DEFENDANTS**

8    238.    Plaintiffs incorporate by reference paragraphs 1 through 184 above.

9    239.    At all relevant times, PWI had a right to the BAD BOY Trademarks and the BAD

10   BOY Copyrights.

11   240.    At all relevant times, defendants acquired certain of the BAD BOY Trademarks

12   and the BAD BOY Copyrights through fraud and deceit and/or otherwise wrongful conduct.

13   241.    By virtue of the Horizonte, Caldas, Jr. and Ramos' fraudulent and wrongful acts,

14   the defendants hold the certain of the BAD BOY Trademarks and the BAD BOY Copyrights as a

15   constructive trustee for the benefit of PWI.

16   242.    The above-described conduct of Horizonte, Caldas, Jr. and Ramos was

17   oppressive, malicious and fraudulent, and was intended to cause injury to PWI.  Horizonte,

18   Caldas, Jr. and Ramos are therefore liable for exemplary or punitive damages.

19                         **TENTH CAUSE OF ACTION**

20   **UNFAIR COMPETITION (Cal. Bus. & Prof. Code § 17200) – PWI, THE ESTATE AND**

21                    **THE TRUST AGAINST ALL DEFENDANTS**

22   243.    Plaintiffs incorporate by reference paragraphs 1 through 184 above.

23   244.    California Business & Professions Code section 17200, *et seq.*, prohibits any

24   person or entity involved in any business or profession in the State of California from engaging

25   unfair competition, including engaging in any unlawful, unfair or fraudulent business act or

26   practice.

27   245.    The conduct of Horizonte, Caldas, Jr. and Ramos alleged in this complaint

28   violated California Business & Professions Code section 17200, *et seq.*

---

33

Complaint

246.   PWI, the Estate and the Trust have been and continue to be harmed by defendants' unfair competition and plaintiffs are entitled to injunctive relief remedying and preventing such unfair competition and restitution.

## ELEVENTH CAUSE OF ACTION

### FRAUD AND DECEIT – PWI AGAINST ALL DEFENDANTS

247.   Plaintiffs incorporate by reference paragraphs 1 through 184 above.

248.   At all relevant times, the defendants and each of them knew that Laurens was acting on PWI's behalf without authority and in direct contravention of the judgment entered in the Shareholder Litigation.

249.   At all relevant times, the defendants further knew that Laurens was acting against the best interests of PWI in favor of his own personal interests and the interests of Horizonte.

250.   The defendants and each of them intentionally participated with Laurens in his scheme to strip away the valuable trademark rights belonging to PWI.

251.   As alleged above in detail, the defendants intentionally suppressed such information from PWI to further their scheme to strip away the valuable trademark rights belonging to PWI.

252.   As alleged above in detail, defendants made misrepresentations of material fact to PWI including, *inter alia*, misrepresenting to PWI that Horizonte was acting in good faith and misrepresenting how PWI obtained the International Class 5 and International Class 32 registrations in Brazil as alleged herein.

253.   Defendants intended to induce PWI's reliance upon defendants' suppression of information and misrepresentation of material facts.

254.   PWI relied to its detriment that the defendants would act in a manner consistent with good faith and fair dealing in connection with the business relationship between PWI and Horizonte.

255.   PWI also relied to its detriment upon the defendants' aforementioned conduct by (1) forbearing taking legal action with respect to the defendants, (2) incurring attorneys' fees and costs in connection with attempting to negotiate an agreement with Horizonte consistent with the

34

Complaint

purported deal that Horizonte claimed it had been negotiating with Laurens, (3) incurring travel expenses associated with trips to meet with Horizonte and others in the course of negotiating with Horizonte for a deal consistent with the purported deal that Horizonte claimed it had been negotiating with Laurens, and (4) voluntarily dismissing Horizonte from the San Diego Superior Court contempt proceeding alleged herein.

256.    PWI has been damaged as a direct and proximate result of defendants' wrongful acts as set forth above.

257.    The above-described conduct of Horizonte, Caldas, Jr. and Ramos was oppressive, malicious and fraudulent, and was intended to cause injury to PWI.  Horizonte, Caldas, Jr. and Ramos are therefore liable for exemplary or punitive damages.

## TWELFTH CAUSE OF ACTION

### CIVIL CONSPIRACY TO DEFRAUD – PWI AGAINST ALL DEFENDANTS

258.    Plaintiffs incorporate by reference paragraphs 1 through 184 above.

259.    The defendants had knowledge of the facts and circumstances alleged above, and actively participated in concert with each other in regard to such acts and omissions.

260.    Based upon the foregoing, the defendants are liable for all damages proximately caused by their actions.

261.    The foregoing fraudulent activities, as actively participated in by the defendants, proximately caused damage to PWI.

262.    The conduct of the defendants was not privileged or justified.

263.    The above-described conduct of Horizonte, Caldas, Jr. and Ramos was oppressive, malicious and fraudulent, and was intended to cause injury to PWI.  Horizonte, Caldas, Jr. and Ramos are therefore liable for exemplary or punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment be entered in their favor and against defendants as follows:

1.      for actual compensatory, consequential, incidental and special damages in an amount to be proven at trial;

Complaint

2.   for injunctive relief including, *inter alia*, an order enjoining the defendants from exercising or purporting to exercise any rights under the purported backdated fraudulent agreements and assignments;

3.   for a declaration that the document entitled "Trademark Assignment" is invalid and unenforceable;

4.   for a declaration that the documents entitled "Deed of Assignment" are invalid and unenforceable;

5.   for a declaration that the document entitled "Assignment" is invalid and unenforceable;

6.   for a declaration that the Big Blue/Horizonte Trademark Transfer Agreement is invalid and unenforceable;

7.   for an order conveying the return of PWI's intellectual property to PWI;

8.   for an order voiding the purported conveyances;

9.   for punitive and exemplary damages;

10.   for such civil penalties as allowed by law;

11.   for attorneys' fees and costs of the suit as allowed by law;

12.   for pre-judgment and post-judgment interest as allowed by law; and,

13.   for such other and further relief as the Court deems just and proper.

Dated:  February 2, 2007

Karen B. King, Esq.
Attorney for plaintiffs

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address):

Michael H. Riney, Esq. (116137)    Karen B. King, Esq. (167568)
600 West Broadway                  501 West Broadway
Suite 950                          Suite 2020
San Diego, CA  92101               San Diego, CA  92101
                                   Telephone:  (619) 702-2301
TELEPHONE NO.: (619) 330-3000  FAX NO.: (619) 330-3010
ATTORNEY FOR (Name): Plaintiffs PLATYPUS WEAR, INC., et al.

**FOR COURT USE ONLY**

F I L E D
Clerk of the Superior Court
APR 03 2007
By: M. WONG-JIMENEZ, Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

| | |
|---|---|
| [X] | HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827 |
| [ ] | MADGE BRADLEY BLDG., 1409 4TH AVE., SAN DIEGO, CA 92101-3105 |
| [ ] | NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92081-6643 |
| [ ] | EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941 |
| [ ] | RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065-5200 |
| [ ] | SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649 |

PLAINTIFF(S)/PETITIONER(S) PLATYPUS WEAR, INC., et al.

DEFENDANT(S)/RESPONDENT(S) HORIZONTE LTDA, et al.

[X] I/C JUDGE  Hon. Richard E. L. Strauss
[ ] MASTER CALENDAR
DEPT 75

CERTIFICATE OF:
PROGRESS; INABILITY TO RESPOND; INABILITY TO DEFAULT
(San Diego Superior Court Rules: Division II, rules 2.5, 2.6, 2.7, 2.34;
Division IV rules 4.169 & 4.170)

CASE NUMBER
GIC 879491

MUST BE FILED ON COURT APPROVED FORM WITH A STAMPED, SELF-ADDRESSED ENVELOPE OR MESSENGER SERVICE SLIP.

The [X] plaintiff(s) [ ] defendant(s) in the above-entitled case, by and through their attorney(s) Michael H. Riney,

Esq. and Karen B. King, Esq. _____ certify that: *(CHECK ONE BOX)*

C1 [X] Plaintiff has been unable to serve the complaint on defendant(s) HORIZONTE LTDA, FERNANDO MARIA AGOSTINHO
PEREIRA CALDAS, JR. and ROBERTO SILVA RAMOS                     (May list more than one defendant)

C1 [ ] Plaintiff requests stay under claim for uninsured/underinsured as to: _____
                                                                    (ALL or list individual(s))

C5 [ ] Defendant was served on _____, and is unable to answer or otherwise respond.

C8 [ ] Plaintiff served defendant on _____, but was unable to request entry of default.

Therefore, it is requested that the time be extended until  June 4, 2007  for filing of a(n):

[X] CERTIFICATE OF SERVICE (SDSC CIV-345)

[ ] ANSWER OR OTHER DEFENDANT APPEARANCE

[ ] REQUEST FOR ENTRY OF DEFAULT (SDSC CIV-204)

Reason(s): Please see Attachment "A" hereto. _____

I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct:

Dated: April 3, 2007 _____

SIGNATURE OF ATTORNEY(S)
Michael H. Riney, Esq.                          Karen B. King, Esq.

**FOR COURT USE ONLY**                          6/4/07

[ ] EXTENSION GRANTED - DOCUMENT CHECKED ABOVE SHALL BE FILED NOT LATER THAN: _____

[ ] EXTENSION DENIED - THIS MATTER IS SET FOR HEARING ON: _____ AT: _____ M. DEPT

[ ] INSUFFICIENT REASON FOR DELAY OF CASE.

[ ] OBTAIN ORDER FOR PUBLICATION IMMEDIATELY.            RICHARD E. L. STRAUSS

DATED: 4/6/07                                           JUDGE OF THE SUPERIOR COURT

[ ] NOTICE TO COUNSEL REQUESTING EXTENSION: After Court's decision, you must serve a copy of this certificate on all counsel concerned.

CERTIFICATE OF:
PROGRESS; INABILITY TO RESPOND; INABILITY TO DEFAULT

SDSC CIV-144(Rev. 4-04)

SC-144

*Platypus Wear, Inc., et al. v. Horizonte, Ltda., et al.*
San Diego Superior Court case number GIC 879491

<u>Attachment "A" to Certificate of Progress</u>

Plaintiffs have initiated service of the Brazilian-resident defendants in Brazil by registered mail, return receipt requested, pursuant to Code of Civil Procedure section 415.40. On April 2, 2007, Plaintiffs received a return receipt apparently signed by an agent of defendant Horizonte as well as the original service package mailed to defendants Horizonte and Caldas, Jr. Plaintiffs are presently having certain remarks on the package translated and are researching the effectiveness of the service upon Horizonte and Caldas, Jr. Service upon defendant Ramos is outstanding. The United States Postal Service ("U.S.P.S.") website's tracking service indicates that the service package has not yet arrived at the Brazilian mailing address. If the document is not received shortly, Plaintiffs are informed that the next step is to initiate an inquiry with the U.S.P.S. Should such an inquiry be required, Plaintiffs are informed that such inquiry may take up to 60 days from the date the inquiry is initiate to resolve.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-20976-CIV-MORENO

PLATYPUS WEAR, INC., a California
corporation,

    Plaintiff,

v.

CLARKE MODET & CO., INC., a Florida
corporation; CLARKE, MODET AND
COMPANY, S.L., a foreign corporation; ELISA
SANTUCCI, an individual, FERNANDO
CALDAS PEREIRA CALDAS, SR., an
individual, FERNANDO MARIA AGOSTINHO
PEREIRA CALDAS, JR., an individual,
ROBERTO SILVA RAMOS, an individual,
FREDERICO DE CARVALHO MARQUES
D'OREY MENANO, an individual, and
ANTONIO MANUEL PEREIRA CALDAS
CASTRO HENRIQUES, an individual,

    Defendants.

_____/

## AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

    Plaintiff Platypus Wear, Inc. ("PWI"), files this Amended Complaint for Damages and Demand for Jury Trial against Defendants Clarke Modet & Co., Inc., Clarke Modet and Company, S.L., Elisa Santucci, Fernando Caldas, Sr., Fernando Maria Agostinho Pereira Caldas, Jr., Frederico de Carvalho Marques D'Orey Menano, and Antonio Manuel Pereira Caldas Castro Henriques, and says:

## PRELIMINARY STATEMENT

    1.    This is an action by PWI to recover damages incurred as a result of the Defendants' scheme to strip away PWI's trademarks. PWI is the owner of various trademarks relating to the "BAD BOY" brand. Defendants engaged in a pattern of racketeering activity, theft, fraud, conversion, legal malpractice and breaches of fiduciary duties by which they stole and/or illegally transferred PWI's intellectual property for the benefit of Defendants, Laurens

1

Officer, and a Brazilian company known as Big Blue in locations which include, but are not limited to, the United States, Europe, Brazil, and Mexico. As a result of Defendants' unlawful actions, PWI has incurred millions of dollars in damages including attorneys' fees defending its trademarks and lost past and future revenue.

## PARTIES, JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3) because the amount in controversy exceeds $75,000, exclusive of interest and costs, is between citizens of different states and citizens or subjects of a foreign state are additional parties.

3.    Plaintiff Platypus Wear, Inc. is a Nevada corporation with its principal place of business in Las Vegas, Nevada. Plaintiff does business as Bad Boy Brands.

4.    Defendant Clarke Modet and Company, S.L. ("Clarke Modet, S.L.") is a law firm based in Spain, with offices in, among other locations, Brazil and Florida. Clarke Modet & Co., Inc. ("Clarke Modet, Inc.") is a Florida corporation that is owned and operated by Clarke Modet, S.L. with offices located at 1221 Brickell Avenue, Suite 940, Miami, Florida. Clarke Modet, S.L. operates its law practice in Miami, Florida through Clarke Modet, Inc. Defendants Clarke Modet, S.L. and Clarke Modet, Inc. shall collectively be referred to as "Clarke Modet."

5.    On information and belief, Defendant Elisa Santucci ("Santucci") is an individual residing in Brazil. At all relevant times, Santucci was and is an agent and/or employee and/or partner of Clarke Modet and, in doing the things herein alleged, was acting within the scope of such agency and/or employment and/or partnership.

6.    On information and belief, Defendant Fernando Caldas Pereira Caldas, Sr. ("Caldas, Sr.") is a Portuguese resident and refers to himself as a partner of Horizonte, Ltda., on information and belief, a Brazilian limited partnership ("Horizonte").

7.    On information and belief, Defendant Fernando Maria Agostinho Pereira Caldas, Jr. ("Caldas, Jr.") is the son of Caldas, Sr., is a Portuguese resident and refers to himself as a partner of Horizonte.

2

8.  On information and belief, Defendant Roberto Silva Ramos ("Ramos") is either a Portuguese or a Brazilian resident and refers to himself as a partner of Horizonte.

9.  On information and belief, Defendant Frederico de Carvalho Marques D'Orey Menano ("Menano") is either a Portuguese or Brazilian resident and refers to himself as a partner of Horizonte.

10.  On information and belief, Defendant Antonio Manuel Pereira Caldas Castro Henriques ("Henriques") is a Portuguese resident and refers to himself as a partner of Horizonte.

11.  Defendants Caldas, Sr., Caldas, Jr., Ramos, Menano and Henriques are collectively referred to as the "Horizonte Defendants." Clarke Model, Santucci and the Horizonte Defendants are sometimes collectively referred to as the "Defendants."

12.  At all times material hereto, the Horizonte Defendants were acting within their authority and in pursuit of the business of Horizonte.

13.  This Court has personal jurisdiction over each of the Defendants pursuant to and in accordance with Florida Statutes §§ 48.193(1)(a)(b)(f) and/or (2), because at all times material hereto each of the Defendants did one or more of the following, each of which is sufficient to establish jurisdiction over them: (i) operated, conducted, engaged in or carried on a business or business venture in Florida or had an office or agency in Florida; (ii) committed tortious acts within Florida; (iii) caused injury to persons, and/or property within Florida, at or about the time that they were engaged in solicitation or service activities in Florida, by, among other things, the following: (a) acquiescing and/or being a willing participant in acts that caused injury to persons, and/or property within Florida, (b) being physically present in this jurisdiction while engaging in the commission of the tortious acts mentioned below, (c) engaging in communications, i.e. telephone, e-mail, facsimile, dealing with the facts and circumstances mentioned below, and (d) attending in person meetings in Florida during the period of time the causes of action alleged herein accrued; and, (iii) engaged in substantial and not isolated activity within Florida.

3

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2) and 1391(a)(3) in that a substantial part of the events or omissions on which the claim is based occurred within this District in Miami, Florida.

## GENERAL ALLEGATIONS RELATED TO ALL COUNTS

**A.     PWI.**

15.     PWI has been in business since 1984 and is in the business of licensing the use of its intellectual property in the United States and around the world.

16.     At all relevant times, PWI has been the owner of trademark rights in the mark "BAD BOY," and related design marks.

17.     At all relevant times, PWI has been the owner of United States Copyright, VA 734-334, registered September 27, 1995, for the copyright of a face design commonly used with PWI's "BAD BOY" registered trademark.

**B.     Illicit Management and Control of PWI.**

18.     Until June 2003, PWI was illicitly controlled by Laurens Offner ("Laurens"), who claimed to be PWI's controlling shareholder.

19.     Laurens had usurped control over PWI from Laurens' elderly father, the late Dr. Franklin F. Offner, PWI's true controlling shareholder.

20.     In 2002, some of PWI's other shareholders filed actions in San Diego Superior Court seeking, *inter alia*, to remove Laurens from his illegitimate position of control over PWI and for a judicial declaration as to PWI's true ownership (the San Diego Superior Court actions are hereafter referred to collectively as the "Shareholder Litigation"). This lawsuit placed the Horizonte Defendants' use of PWI's intellectual property in jeopardy.

21.     Early in the Shareholder Litigation, on May 16, 2002, the San Diego Superior Court entered an order enjoining Laurens from transferring PWI's trademarks without a majority vote of PWI's board of directors (the "May 16, 2002 order").

22.     The Shareholder Litigation was tried to a jury in May and June of 2003.

4

23.. On June 27, 2003, the San Diego Superior Court trial judge entered judgment in the Shareholder Litigation (the "Judgment"), which judgment ruled, *inter alia*:

    (1)    Laurens embezzled $588,535.00 from PWI;

    (2)    Clear and convincing evidence established that Laurens committed fraud, oppression and malice and was liable to PWI for punitive damages in the amount of $150,000;

    (3)    Laurens was enjoined from acting as a director of PWI until at least June 26, 2007;

    (4)    Laurens was enjoined from acting on behalf of PWI; and,

    (5)    Laurens owned only a minority interest in PWI.

24. Pursuant to the Judgment, PWI's current management took control over PWI at the conclusion of the trial in the Shareholder Litigation. PWI's current management is hereafter referred to as "PWI's Management."

25. On April 29, 2005, the San Diego Superior Court accepted ten stipulated findings of contempt against Laurens, which findings included admissions to the following misconduct:

    (1)    Purporting to transfer PWI's "BAD BOY" trademark rights to PWI's licensee Big Blue in violation of the Court's May 16, 2002 order;

    (2)    Purporting to transfer PWI's "BAD BOY" trademark rights in Europe to Horizonte in violation of the May 16, 2002 order; and,

    (3)    Purporting to transfer PWI's "BAD BOY" trademark rights in the United States to Horizonte in violation of the May 16, 2002 order.

26. On April 29, 2005, the San Diego Superior Court entered judgment against Laurens adjudging Laurens to be in contempt of court.

**C.**    **PWI's Former Brazilian Counsel.**

27. While under the illicit control of Laurens, and continuing until on or about October, 2003, PWI's intellectual property interests in Brazil were represented by the international law firm Defendant Clarke Modet and its partner, Defendant Santucci.

5

28.     Clarke Modet and Santucci's representation of PWI included representing PWI in legal matters related to PWI's licensee Big Blue Comercio Ltda. ("Big Blue") and Horizonte, discussed *infra*.

29.     Subsequently, in 2005, PWI's Management learned that, as alleged in greater detail herein, Clarke Modet and Santucci, through their representation of PWI, participated with Laurens and the Horizonte Defendants in a scheme to strip PWI of its valuable trademark rights.

30.     Neither Santucci nor Clarke Modet ever disclosed to PWI's Management their participation with Laurens and the Horizonte Defendants in purporting to strip PWI of its valuable trademark rights.

31.     Santucci and Clarke Modet concealed from PWI's Management their participation with Laurens and the Horizonte Defendants in attempting to strip PWI of its valuable trademark rights.

**D.     Horizonte.**

32.     Horizonte produces and distributes beverages and related products.     On information and belief, Horizonte is owned and operated by the Horizonte Defendants and their related entities.

33.     At all relevant times since 2001, Horizonte used and continues to use PWI's "BAD BOY" trademarks and copyright on its products, including having engaged in business to distribute in the United States, and specifically Florida.

**E.     The Criminal Enterprise is Formed.**

34.     During the Shareholder Litigation, it became clear that Laurens was going to lose his illicit control over PWI as a result of an anticipated adverse judgment in the Shareholder Litigation, which, in turn, would adversely impact the Horizonte Defendants who had been utilizing PWI's trademarks.

35.     In April, May or June 2003, Laurens told Santucci and certain of the Horizonte Defendants that he might lose control over PWI.

6

36.     Accordingly, as evidenced by a letter from Ramos to Laurens, no later than June 10, 2003, Laurens and the Defendants formed an association for the sole purpose of stripping PWI of its intellectual property rights by transferring PWI's intellectual property rights to Horizonte.

37.     By no later than June 25, 2003, Santucci was aware that Laurens could not sign a contract on behalf of PWI. In fact, on June 27, 2003, the San Diego Superior Court formally entered judgment in the Shareholder Litigation holding that Laurens had no authority to act on behalf of PWI and enjoining Laurens from acting on behalf of PWI.

38.     At the conclusion of the trial in the Shareholder Litigation and some time prior to July 1, 2003, Laurens advised all or some of the Horizonte Defendants that he had been removed from PWI.

39.     After entry of the June 27, 2003 Judgment, PWI's Management (i.e., the new and legitimate management) attempted to reach Santucci by telephone.

40.     Santucci intentionally avoided responding to PWI's attempt to contact her in order to maintain a façade of ignorance of the fact that Laurens was not authorized to act on behalf of PWI.

41.     After learning that PWI's Management was attempting to contact her, Santucci telephoned Nair Afonso Martinez of Big Blue, a PWI licensee, and informed her about the call from PWI's Management. Martinez stated that Santucci did not return the call because she would not be able to help Big Blue after the call was returned and she was formally told about the change in PWI's management.

F.     **The Enterprise's Pattern of Criminal Activity.**

1.     **The Meeting in Miami, Florida.**

42.     Approximately two weeks after the entry of the Judgment in the Shareholder Litigation, on or about July 12 or 13, 2003, Santucci flew to Miami, Florida to attend a meeting (the "Miami Meeting").

43.     The Miami Meeting was also attended by Laurens, Marco Merhej of Big Blue and Ramos of Horizonte. Caldas, Jr. of Horizonte participated by telephone.

44.     The purpose of the Miami Meeting was to negotiate and execute documents that would implement the criminal enterprise's scheme to fraudulently transfer PWI's intellectual property to Horizonte and Big Blue pursuant to the Defendants' and Laurens' scheme to strip PWI of its intellectual property.

**2.     The Backdated Big Blue Settlement Agreement.**

45.     PWI has had a licensing relationship with Big Blue since 1992.

46.     On or about July 28, 1998, PWI and Big Blue executed a new license agreement (the "1998 Big Blue License Agreement").

47.     The 1998 Big Blue License Agreement confirmed Big Blue's agreement that PWI owned and had exclusive worldwide right, title and interest in and to all United States and worldwide trademarks, copyrights, service marks, trade secrets and other intellectual property rights in any way regarding the "BAD BOY" and "BAD BOY CLUB" marks and designs.

48.     For many years, Big Blue had filed trademark applications and registrations for PWI's "BAD BOY" face and word trademarks in Big Blue's own name and for Big Blue's benefit.

49.     Big Blue had no right to use without PWI's permission the "BAD BOY" trademark applications and registrations that Big Blue had registered in its own name and was required to assign the registration and applications to PWI because: (1) Big Blue was contractually obligated to do so pursuant to paragraph 5.4 of the 1998 Big Blue License Agreement; and, (2) Big Blue's trademarks used PWI's copyright.

50.     On July 25, 2002, based upon Big Blue's failure to pay royalties and assign the trademark rights to PWI, PWI commenced litigation against Big Blue in Federal Court in Brazil (the "*PWI v. Big Blue* action"). Defendants Clarke Modet and Santucci represented PWI in the *PWI v. Big Blue* action. On or about February 25, 2003, the Brazilian Federal Court suspended Big Blue's rights to use PWI's trademarks, by entry of an injunction.

8

51.  At or about the time of the Miami Meeting, Santucci prepared a settlement agreement between Big Blue and PWI designed to settle the *PWI v. Big Blue* action.

52.  Santucci had informed Big Blue in an e-mail that she would sign agreements on behalf of PWI because Laurens was prohibited by a court order from signing agreements on behalf of PWI.

53.  Santucci backdated the settlement agreement that she prepared in or about July 2003 to April 15, 2003 (the "Backdated Big Blue Settlement Agreement"). The document was backdated for the fraudulent purpose of attempting to evade the Judgment in the Shareholder Litigation.

54.  At the Miami Meeting, Marco Merhej of Big Blue was instructed by Laurens and/or all or some of the Horizonte Defendants that Big Blue would receive the Backdated Big Blue Settlement Agreement under certain conditions, which conditions included the requirement that Big Blue transfer to Horizonte Big Blue's trademark applications for the "BAD BOY" brand related to products in International Class 5 and International Class 32.

55.  Laurens and Santucci required Big Blue to assign to Horizonte those applications in order to receive PWI's intellectual property that the Brazilian Federal Court had suspended Big Blue from using.

56.  Pursuant to the Backdated Big Blue Settlement Agreement drafted by Santucci:

(1)  PWI's lawsuit against Big Blue was fully settled;

(2)  Big Blue was permitted to retain all trademark registrations and applications originally registered or filed in its name;

(3)  PWI forfeited any right to past damages/royalties; and

(4)  Big Blue was required to pay $50,000 annually to PWI, beginning two years after the purported settlement.

57.  In exchange for receiving the Backdated Big Blue Settlement Agreement, Big Blue assigned to Horizonte the applications related to products in International Class 5 and International Class 32.

9

58.   In order to create a basis in the Backdated Big Blue Settlement Agreement for disregarding PWI's rights under the 1998 License Agreement between PWI and Big Blue, Santucci included in the Backdated Big Blue Settlement Agreement a clause stating that Marco Merhej, who signed the 1998 License Agreement on behalf of Big Blue, did not "have sufficient knowledge of the English language."

59.   At all relevant times, Marco Merhej of Big Blue has been capable of speaking, reading and understanding the English language fluently.

60.   At all relevant times, Santucci knew that Marco Merhej of Big Blue was capable of speaking, reading and understanding the English language fluently.

61.   Santucci was the only person to sign the Backdated Big Blue Settlement Agreement on behalf of PWI.  At the time she signed the agreement, neither Clarke Modet nor Santucci were authorized by PWI to negotiate and execute the Backdated Big Blue Settlement Agreement on PWI's behalf.

62.   Nair Afonso Martinez of Big Blue did not sign the Backdated Big Blue Settlement Agreement at the Miami Meeting.

63.   Rather, Santucci returned to her office in Rio de Janeiro, Brazil with the Backdated Big Blue Settlement Agreement at which time she requested Nair Afonso Martinez of Big Blue to fly to Rio de Janeiro to sign the Backdated Big Blue Settlement Agreement in Santucci's office.

64.   Nair Afonso Martinez flew to Rio de Janeiro as requested by Santucci and signed the Backdated Big Blue Settlement Agreement in Santucci's office.

65.   In order to conceal the fact that she was working against her client PWI's interests, Santucci caused Horizonte and/or all or some of the Horizonte Defendants to pay Santucci's legal fees in connection with the Miami Meeting and the drafting of the Backdated Big Blue Settlement Agreement.

66.   The Backdated Big Blue Settlement Agreement was filed with the Brazilian Federal Court on or about July 17, 2003.

10

67.     Santucci subsequently faxed to PWI's Management in San Diego a copy of the Backdated Big Blue Settlement Agreement.

### 3.     The Big Blue/Laurens Profit Sharing Agreement.

68.     Also at the Miami Meeting, Big Blue and Laurens signed a document by which it was agreed that Laurens would receive fifty percent (50%) of Big Blue's profits from the future use of the trademarks including "BAD BOY," "BAD GIRL," "BAD BOY CLUB," "Face" Mark, and the "Original Logo" Mark ("Big Blue/Laurens Profit Sharing Agreement").

69.     Santucci was involved, either directly or indirectly, in the negotiating and executing of the Big Blue/Laurens Profit Sharing Agreement.  Neither Clarke Modet nor Santucci were authorized by PWI to negotiate the Big Blue/Laurens Profit Sharing Agreement.

70.     All or some of the Horizonte Defendants were involved and participated in the negotiation and execution of the Big Blue/Laurens Profit Sharing Agreement.

### 4.     The Big Blue/Horizonte Trademark Transfer Agreement.

71.     Also at the Miami Meeting, it was agreed among Santucci, Laurens, all or some of the Horizonte Defendants and Big Blue, that Big Blue would be required to transfer to Horizonte the trademark applications related to products in International Class 5 and International Class 32 from Big Blue as a condition to Big Blue's receiving PWI's intellectual property pursuant to the Backdated Big Blue Settlement Agreement (the "Big Blue/Horizonte Trademark Transfer Agreement").

72.     At the time the Big Blue/Horizonte Trademark Transfer Agreement was made, the order of the Brazilian Federal Court suspending all rights on applications and registrations in the name of Big Blue remained in full force.

73.     At the time the Big Blue/Horizonte Trademark Transfer Agreement was made, Santucci knew that the order of the Brazilian Federal Court suspending all rights on applications and registrations in the name of Big Blue remained in full force.

74.     A document reflecting the Big Blue/Horizonte Trademark Transfer Agreement was created at the Miami Meeting.

11

75.     The document reflecting the Big Blue/Horizonte Trademark Transfer Agreement had the following important and unusual conditions:

      (1)     Horizonte would be required to pay Marco Merhej of Big Blue or Big Blue monthly;

      (2)     Marco Merhej of Big Blue would have control over marketing of the product; and

      (3)     In the event that Horizonte breached certain terms of the agreement, Horizonte would forfeit the applications or registrations and be required to pay Big Blue liquidated damages of R $2 million.

76.     The document reflecting the Big Blue/Horizonte Trademark Transfer Agreement was dated but not signed in May 2003.  A revised version of this agreement was subsequently signed sometime after the Miami Meeting.

77.     Santucci was involved, either directly or indirectly, in the negotiating and executing of the document reflecting the Big Blue/Horizonte Trademark Transfer Agreement.  Neither Clarke Modet nor Santucci were authorized by PWI to negotiate and execute the document reflecting the Big Blue/Horizonte Trademark Transfer Agreement.

**5.     The Laurens Veto Agreement.**

78.     Also at the Miami Meeting, Marco Merhej of Big Blue and Ramos of Horizonte signed a document, the terms of which granted Laurens veto control over the "BAD BOY" brand and the "BAD BOY" marks (the "Laurens Veto Agreement").  Caldas, Jr. subsequently signed the Laurens Veto Agreement.

79.     The Laurens Veto Agreement constituted a business arrangement, deal or transaction with Laurens, individually.

80.     Santucci was involved, either directly or indirectly, in the negotiating and executing of the Laurens Veto Agreement.  Neither Clarke Modet nor Santucci were authorized by PWI to negotiate and execute the Laurens Veto Agreement.

81.    The intended effect of the Laurens Veto Agreement was to grant control provided to Marco Merhej to Laurens, thereby effectively giving Laurens, individually, control over the "BAD BOY" brand.

82.    Following the Miami Meeting, Ramos transported to Sao Paulo some of the above-referenced documents, including the Big Blue/Laurens Profit Sharing Agreement and the Laurens Veto Agreement. Ramos presented the Big Blue/Laurens Profit Sharing Agreement and the Laurens Veto Agreement to Nair Afonso Martinez of Big Blue for signature.

83.    Despite execution of the Laurens Veto Agreement, in furtherance of their scheme to strip away PWI's trademarks, Caldas, Jr. filed with the San Diego Superior Court a false declaration dated January 16, 2004 stating: "Horizonte has never engaged in any separate business arrangements, deals or transactions with Laurens Offner as an individual."

84.    Caldas, Jr. caused his false declaration to be faxed to a location in the United States in furtherance of the Defendants' scheme to steal PWI's intellectual property.

6.    The "Temporary Assignment Agreement."

85.    On June 10, 2003, Ramos transmitted to Laurens by facsimile four pages of correspondence.  In the correspondence, Ramos demanded reassignment of the trademark applications from PWI to Horizonte based upon a claimed verbal agreement purportedly requiring PWI to reassign them.

86.    Ramos' correspondence also demanded reassignment of United States trademark application(s) from PWI to Horizonte.

87.    Ramos' correspondence was sent to Laurens during the trial in the Shareholder Litigation, at a time when Laurens' loss of control over PWI was imminent.

88.    At the time Ramos sent the correspondence to Laurens, all or some of the Horizonte Defendants were aware that the trial in the Shareholder Litigation was underway.

89.    Subsequently, all or some of the Horizonte Defendants created yet another backdated and fraudulent agreement called the "Temporary Assignment Agreement."

13

90.     The "Temporary Assignment Agreement" was signed by Laurens (purportedly on behalf of PWI) and by Caldas, Jr., Ramos and Menano.

91.     The "Temporary Assignment Agreement" purported to be signed on June 20, 2002.

92.     However, the "Temporary Assignment Agreement" was not signed in June 2002.

93.     The "Temporary Assignment Agreement" in fact was not signed until after entry of Judgment in the Shareholder Litigation and was backdated.    Indeed, the "Temporary Assignment Agreement" was notarized in October 2003, approximately four months after the Judgment was entered.

94.     Horizonte sued PWI in Brazil to enforce the backdated "Temporary Assignment Agreement."

95.     All or some of the Horizonte Defendants falsely represented to the San Diego Superior Court that the "Temporary Assignment Agreement" was signed on June 20, 2002.

96.     All or some of the Horizonte Defendants attempted to use the backdated "Temporary Assignment Agreement" as a basis to gain financial benefits from PWI.

97.     All or some of the Horizonte Defendants used the United States wire or mail services to transmit the "Temporary Assignment Agreement" in furtherance of their scheme to steal PWI's intellectual property.

**7.      The United States, European and Japanese Trademark Applications.**

98.     Following entry of the Judgment in the Shareholder Litigation, all or some of the Horizonte Defendants caused Laurens, purportedly on PWI's behalf, to sign an assignment of PWI's "BAD BOY" trademark applications for the United States, Europe and Japan.

99.     All or some of the Horizonte Defendants knowingly filed, or caused to be filed, the false, backdated and fraudulent assignments with the United States Patent & Trademark Office, the Office for Harmonization in the Internal Market (Trade Marks and Designs), and the trademark office in Japan.

100.    Plaintiff is informed and believes, and thereon alleges, that the Horizonte Defendants used, or caused to be used, the United States wire or mail services to transmit the backdated trademark assignments in furtherance of their scheme to steal PWI's intellectual property.

G.    **Santucci Conceals Information Concerning the Backdated Big Blue Settlement Agreement from PWI's Management.**

101.    On or about August 13, 2003, Santucci faxed to PWI the Backdated Big Blue Settlement Agreement.

102.    After receiving the Backdated Big Blue Settlement Agreement, PWI's Management contacted Santucci to discuss ways to avoid the agreement.

103.    PWI's Management did not know the Backdated Big Blue Settlement Agreement was backdated at that time.

104.    In a letter dated August 28, 2003, Santucci wrote to PWI's Management: "It is my opinion that, unfortunately, little could be done at this point to reverse the terms of the agreement signed by the parties; no one in Brazil, at the time the agreement was signed, knew that Mr. Laurens Offner had been prevented from acting on behalf of Platypus in view of a court order."

105.    In or about October 2003, PWI's current president, Robin Offner, flew to Brazil to meet with Santucci and discuss ways to challenge the Backdated Big Blue Settlement Agreement, which had not been authorized by PWI's Management.

106.    During their meeting, Santucci expressed to Robin Offner: (1) her opinion that all of the parties to the Backdated Big Blue Settlement Agreement believed Laurens to have authority to enter the agreement; and, (2) her opinion that there was nothing PWI could do to unwind the Backdated Big Blue Settlement Agreement.

107.    In fact, there were multiple actions that PWI could have taken to unwind the Backdated Big Blue Settlement Agreement or mitigate its negative effect on PWI.

108.   For example, PWI was permitted to file an appeal of the Backdated Big Blue Settlement Agreement.

109.   However, Santucci did not advise PWI's Management of PWI's ability to file an appeal. Nor did Santucci advise PWI's Management of the imminent deadline for PWI to file such an appeal.

110.   Santucci also disclosed in writing to Nair Afonso Martinez of Big Blue PWI's confidential attorney-client communications.

111.   Santucci did not obtain permission from PWI's Management to disclose to Nair Afonso Martinez PWI's confidential attorney-client communications, nor did Santucci advise PWI's Management that she was disclosing to Nair Afonso Martinez PWI's confidential attorney-client communications.

112.   Several months after Laurens was judicially removed from PWI, and after Santucci was aware of Laurens' removal, Santucci disclosed her privileged communications with PWI's Management to Laurens.

113.   Santucci did not obtain permission from PWI's Management to disclose to Laurens PWI's confidential attorney-client communications with Santucci, nor did Santucci advise PWI's Management that she was disclosing to Laurens PWI's confidential attorney-client communications.

**H.     PWI's New Agreement with Big Blue.**

114.   Subsequent to meeting with Santucci, PWI's Management met with Big Blue. Based upon PWI's Management's then-knowledge (which knowledge was limited by Santucci's and the Horizonte Defendants' withholding of information as alleged herein), PWI's Management entered into a new settlement agreement with Big Blue in August 2004.

115.   PWI's Management was unaware of the Miami Meeting at the time PWI's Management negotiated and entered into the new settlement agreement with Big Blue.

116.   Had PWI's Management been aware of the Miami Meeting and the Backdated Big Blue Settlement Agreement, PWI would have negotiated and obtained a more favorable settlement.

117.   Pursuant to the new settlement agreement between PWI (through PWI's Management) and Big Blue, PWI reacquired all of its trademark applications and registrations. However, PWI's Management was forced to waive millions of dollars of royalties to which PWI otherwise would have been entitled and reduce future royalties.

**I.      Santucci and Horizonte Register the "BAD BOY" Mark in Mexico in Horizonte's Name.**

118.   Notwithstanding the attorney-client relationship with PWI, as part of the scheme to strip away PWI's trademarks, on or about May 21, 2003, Santucci caused the "BAD BOY POWER DRINK" trademark to be registered in Horizonte's name in Mexico, as requested by Horizonte.

### FIRST CAUSE OF ACTION

### LEGAL MALPRACTICE –

### AGAINST DEFENDANTS CLARKE MODET AND SANTUCCI

119.   Plaintiff re-alleges paragraphs 1 through 118 of the Complaint as if fully set forth herein.

120.   Clarke Modet was employed by PWI to provide legal advice during the time periods at issue. Santucci was the partner or shareholder representative from Clarke Modet who performed the majority of the work done by Clarke Modet.

121.   As a result of the attorney-client relationship between PWI and Clarke Modet, Clarke Modet and Santucci owed duties to PWI, including:

(i)     the duty of care, which requires an attorney to have the knowledge and skill necessary to confront the circumstances of each case;

(ii)    the duty to represent the client and handle the client's affairs with the utmost degree of honesty, forthrightness, loyalty and fidelity;

(iii)   the duty of loyalty, including the obligation to fully and fairly disclose actual or potential conflicts of interest; and

17

      (iv)    fiduciary duties, including the duty to make a full and fair disclosure of material facts.

122.    Rather than honor those duties owed to PWI, Clarke Modet and Santucci acted against PWI's interests and instead advised and protected the interests of Laurens, Horizonte and Big Blue, even after the entry of the Judgment finding that Laurens lacked the authority to act on PWI's behalf.  Specifically, Clarke Modet and Santucci breached duties owed to PWI, including, but not limited to: by assisting Laurens in his scheme to strip PWI of its assets, including purporting to enter a series of back-dated and secret transactions, which are alleged in further detail above; by failing fully and properly to advise PWI concerning Laurens' scheme and the entry by PWI into the series of agreements and transactions alleged above; by taking on conflicting representations; by failing to provide fair, unbiased and adequate legal advice; by negotiating and causing to be executed agreements without PWI's authority to do so; by entering into agreements on PWI's behalf without PWI's authority; by failing to make reasonable efforts to verify the facts on which they based their legal advice; and, by failing to protect PWI's valuable assets, its trademarks and copyrights.

123.    As a direct and proximate result of Clarke Modet's and Santucci's breaches of their duties, PWI suffered monetary losses and liability of millions of dollars.

**SECOND CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY -**

**AGAINST DEFENDANTS CLARKE MODET AND SANTUCCI**

124.    Plaintiff re-alleges paragraphs 1 through 118 of the Complaint as if fully set forth herein.

125.    In acting as attorneys for PWI, Clarke Modet and Santucci owed fiduciary duties to PWI, including without limitation the duty to make a full and fair disclosure of material facts to PWI and to act loyally to PWI and without conflict.  Specifically, an attorney must represent his client and handle his client's affairs with the utmost degree of honesty, forthrightness, loyalty and fidelity, must proceed in a manner reasonably calculated to advance a client's lawful

18

objectives, must avoid impermissible conflicting interests, and avoid employing advantages arising from the client-lawyer relationship in a manner adverse to the client.

126.   In contravention of their fiduciary duties, Clarke Modet and Santucci took direction from Laurens, a minority shareholder with no authority to act on behalf of or bind PWI, and assisted Laurens' scheme to strip PWI of its assets, including purporting to enter the series of backdated and secret transactions that are alleged above.   Clarke Modet and Santucci failed to fully and adequately disclose to PWI's Management the nature of the agreements and transactions that Laurens was purporting to enter into on PWI's behalf.

127.   Moreover, Laurens, Horizonte and Big Blue were acting adverse to PWI and Clarke Modet and Santucci improperly favored his interests over PWI's.

128.   Accordingly, as a direct and proximate result of Clarke Modet's and Santucci's breaches of their fiduciary duties, PWI suffered monetary losses and liability of millions of dollars.

**THIRD CAUSE OF ACTION**

**FRAUD - AGAINST ALL DEFENDANTS**

129.   Plaintiff re-alleges paragraphs 1 through 118 of the Complaint as if fully set forth herein.

130.   At all relevant times, Defendants knew that Laurens was acting on PWI's behalf without authority and in direct contravention of the Judgment.

131.   At all relevant times, Defendants further knew that Laurens was acting against the best interests of PWI in favor of his own personal interests and the interests of Horizonte.

132.   Defendants intentionally participated with Laurens in his scheme to strip away the valuable trademark rights belonging to PWI.

133.   Defendants intentionally suppressed such information from PWI's Management to further their scheme to strip away the valuable trademark rights belonging to PWI.

134.   PWI relied upon Clarke Modet and Santucci, as its counsel, to act in PWI's best interests and in a manner consistent with the fiduciary duties owed to PWI.   Clarke Modet and

Santucci acted in a manner to cause PWI to believe that they would act in PWI's best interests and in a manner consistent with the fiduciary duties owed to PWI. PWI relied to its detriment upon such representations.

135.   PWI relied to its detriment that the Horizonte Defendants would act in a manner consistent with good faith and fair dealing in connection with the business relationship between PWI and Horizonte.

136.   PWI has been damaged as a direct and proximate result of Defendants' wrongful acts as set forth above.

### FOURTH CAUSE OF ACTION

### CIVIL CONSPIRACY TO DEFRAUD – AGAINST ALL DEFENDANTS

137.   Plaintiff re-alleges paragraphs 1 through 118 and 129 through 136 of the Complaint as if fully set forth herein.

138.   The Defendants had knowledge of the facts and circumstances alleged above, and actively participated in concert with each other in regard to such acts and omissions.

139.   Based upon the foregoing, the Defendants are liable for all damages proximately caused by their actions.

140.   The foregoing fraudulent activities, as actively participated in by the Defendants, proximately caused damage to PWI.

141.   The conduct of the Defendants was not privileged or justified.

### FIFTH CAUSE OF ACTION

### CONVERSION - AGAINST THE HORIZONTE DEFENDANTS

142.   Plaintiff re-alleges paragraphs 1 through 118 of the Complaint as if fully set forth herein.

143.   At all relevant times, PWI has been the owner of the copyright of a face design commonly used with PWI's "BAD BOY" registered trademark.

144.   At all relevant times, the Horizonte Defendants have known that PWI is the owner of the copyright of a face design commonly used with PWI's "BAD BOY" registered trademark.

145.   Notwithstanding the Horizonte Defendants' actual knowledge of PWI's copyright as alleged herein, the Horizonte Defendants, acting as agents for Horizonte within the authority and in pursuit of the partnership business, have wrongfully converted to their own use PWI's copyright.

146.   PWI has demanded that the Horizonte Defendants cease the use of PWI's copyright.

147.   The Horizonte Defendants have refused.

148.   PWI has been damaged as a direct and proximate result of the Horizonte Defendants' tortious conversion of PWI's copyright, as set forth above.

### SIXTH CAUSE OF ACTION

### VIOLATIONS OF 18 U.S.C. 1962(c) - AGAINST ALL DEFENDANTS

149.   Plaintiff re-alleges paragraphs 1 through 118 of the Complaint as if fully set forth herein.

150.   This is an action for treble damages, interest, attorneys' fees, costs, and other relief pursuant to the civil remedies of the RICO Act, 18 U.S.C. § 1961, et seq., against the Defendants. Each of the Defendants is and at all relevant times has been a person within the meaning of 18 U.S.C. § 1961(3).

### The Enterprise

151.   At all relevant times, an association in fact among Clarke Model, Santucci, and the Horizonte Defendants constituted an "Enterprise" within the meaning of 18 U.S.C. § 1961(4), engaged in interstate commerce and activities which affect interstate commerce, including, *inter alia*, theft of PWI's trademarks and copyrights (the "Trademark Enterprise"). The Trademark Enterprise functioned as a continuing unit within an ascertainable structure separate and apart from that of the conduct or pattern of racketeering activity.

### Goals and Purpose

152.   Using the Trademark Enterprise, the Defendants executed a scheme to defraud PWI for the pecuniary gain of the Defendants by stripping away PWI's trademark rights for the

21

use and benefit of Horizonte and the Horizonte Defendants. The Defendants' overall goal and purpose was to enrich themselves and those who aided and abetted them by using the Trademark Enterprise as a vehicle to: (i) strip away PWI's trademark rights without compensating PWI; (ii) disguise their fraud and maintain their ability to continue their scheme; and (iii) hide, launder, transfer, and dispose of the proceeds of ill-gotten gains through a series backdated and secret agreement among related entities and individuals associated with the Trademark Enterprise.

## Unlawful Conduct of the Trademark Enterprise
## Through a Pattern of Racketeering Activity

153.    The Defendants violated 18 U.S.C. § 1962(c) by conducting the affairs of the Trademark Enterprise through a pattern of racketeering activity which involved multiple violations of the criminal laws of the United States, including wire fraud, in violation of 18 U.S.C. § 1343, mail fraud, in violation of 18 U.S.C. § 1341 and trademark and copyright infringement in violation of 17 U.S.C. § 506as described in paragraphs 42 through 113 and 118, above. These predicate acts were related and had similar purposes, participants, results, victims, and methods of commission.

154.    The Defendants used a series of backdated and secret agreements to: (i) convert to Horizonte's own use PWI's copyright and (ii) backdate and file fraudulent assignments with the United States Patent & Trademark Office, the Office for Harmonization in the Internal Market (Trade Marks and Designs), and the trademark office in Japan.

155.    The Defendants conspired with each other and each actively participated in the conduct of the Trademark Enterprise. Among other things, at a time when each of the Defendants was aware that Laurens had no authority to act on PWI's behalf or was about to lose his authority through entry of the Judgment, the Defendants: (i) met in person and via telephone on numerous occasions in various locations, including Miami, to discuss implementation of their scheme; and (ii) drafted, entered into or aided and abetted others in entering into the Backdated Big Blue Settlement Agreement, the Big Blue/Laurens Profit Sharing Agreement, the Big

22

Blue/Horizonte Trademark Transfer Agreement, and the Temporary Assignment Agreement, which illegally converted for Horizonte's use PWI's trademarks.

156.    In furtherance of the Trademark Enterprise, the Defendants: (i) filed, or caused to be filed, false, backdated and fraudulent assignments with the United States Patent & Trademark Office, the Office for Harmonization in the Internal Market (Trade Marks and Designs), and the trademark office in Japan, purportedly providing Horizonte the use of PWI's trademarks; and (ii) registered, or caused to be registered, the "BAD BOY POWER DRINK" trademark in Horizonte's name in Mexico.

157.    The pattern of racketeering activity is part of the Trademark Enterprise's regular way of doing business.  The Defendants' use of the Trademark Enterprise was designed to extract as large a benefit over as long a period of time as possible from PWI (and others) and has continued for a substantial period of time from at least July 2003 through the present.  The continuing association among the Defendants creates a continuing threat of criminal activity. Indeed, the Defendants have continued to utilize the Trademark Enterprise to illegally use PWI's trademark.

### The Victim and Its Injuries

158.    PWI is a victim of the Defendants' criminal conduct and pattern of racketeering activity, and has been injured in its business and property as a direct and proximate result of the foregoing violations by the Defendants of 18 U.S.C. § 1962, which injury includes, among other things, lost revenue called for in the 1998 Big Blue License Agreement, attorneys' fees incurred recovering and defending PWI's trademarks and waiver of millions of dollars of royalties to which PWI otherwise would have been entitled and reduction of future royalties.

### Effects on Interstate and Foreign Commerce

159.    The Defendants' actions impacted interstate commerce including, but not limited to, commerce among the States of Florida and California.  The Defendants' actions impacted foreign commerce including, but not limited to, commerce among the United States and Brazil. The Defendants were able to accomplish their ends by misusing instrumentalities of interstate

23

and foreign commerce, including mail and wire facilities. Each of these fraudulent and criminal acts has had a serious impact on interstate and foreign commerce.

## SEVENTH CAUSE OF ACTION

### VIOLATIONS OF 18 U.S.C. § 1962(d) – AGAINST ALL DEFENDANTS

160.   Plaintiff re-alleges paragraphs 1 through 118 of the Complaint as if fully set forth herein.

161.   By reason of the foregoing conduct, the Defendants willfully and knowingly conspired with one another, in violation of 18 U.S.C. § 1962(d), to conduct the affairs of the Trademark Enterprise through the foregoing pattern of racketeering activity, consistent with and in furtherance of the scheme.

162.   In furtherance of their conspiracy, the Defendants committed the overt acts described in paragraphs 42 through 113 and 118, above.

163.   PWI has been injured in its business and property as a direct and proximate result of the foregoing violations by the Defendants of 18 U.S.C. § 1962.

## EIGHTH CAUSE OF ACTION

### CIVIL THEFT IN VIOLATION OF FLA. STAT. § 772.11 – AGAINST HENRIQUES AND CALDAS, SR.

164.   Plaintiff re-alleges paragraphs 1 through 118 of the Complaint as if fully set forth herein.

165.   As set forth herein above, Henriques and Caldas, Sr. engaged in a pattern of criminal activity, which resulted in Henriques and Caldas, Sr. stealing PWI's trademark rights.

166.   By reason of the foregoing conduct, Henriques and Caldas, Sr. possessed a felonious intent to deprive PWI of its trademark rights.

167.   Based upon the foregoing, Henriques and Caldas, Sr. are liable for all damages proximately caused by their actions.

24

168.   The foregoing civil theft proximately caused damage to PWI.

169.   The conduct of Henriques and Caldas, Sr. was not privileged or justified.

170.   All conditions precedent to the bringing of this cause of action have been satisfied.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment be entered in its favor and against Defendants as follows:

A.   actual compensatory, consequential, incidental, special and exemplary damages in an amount to be proven at trial;

B.   punitive damages;

C.   such civil penalties as allowed by law;

D.   treble damages;

E.   attorneys' fees and costs of the suit as allowed by law;

F.   pre-judgment and post-judgment interest as allowed by law; and,

G.   such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff Platypus Wear, Inc. hereby demands a trial by jury on all issues so triable.

DATED this **30th** day of June, 2006.

GENOVESE JOBLOVE & BATTISTA, P.A.
4400 Bank of America Tower
100 Southeast Second Street
Miami, Florida 33131
Telephone:   (305) 349-2300
Facsimile:   (305) 349-2310

_____
Michael D. Joblove, Esq.
Florida Bar No. 354147
mjoblove@gjb-law.com
Brett M. Amron, Esq.
Florida Bar No. 148342
bamron@gjb-law.com
*Attorneys for Plaintiff Platypus Wear, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic mail and/or First Class postage-paid U.S. Mail this **30th** day of June, 2006 upon the parties listed on the attached service list.

_____
Brett M. Amron

26

1

## SERVICE LIST

2

CASE NO. 06-20967-CIV-MORENO

3

4

5   Michael D. Joblove, Esq.
    mjoblove@gjb-law.com
6   Brett M. Amron, Esq.
    bamron@gjb-law.com
7   GENOVESE JOBLOVE & BATTISTA, P.A.
    4400 Bank of America Tower
8   100 Southeast Second Street
    Miami, Florida 33131
9   Telephone:    (305) 349-2300
    Facsimile:    (305) 349-2310
10  Attorneys for Plaintiff Platypus Wear, Inc.

11

12  Richard Guerra, Esq.
    RGuerra@FRC-LAW.com
13  FOWLER RODRIGUEZ CHALOS
    806 South Douglas Road, #580
14  Coral Gables, FL 33134-3157
    Telephone: (305) 445-2930
15  Facsimile: (305) 445-2450
16  Attorneys for Clarke Modet & Co., Inc. and
    Clarke, Modet and Company, S.L.

17

18

19

20

21

22

23

24

25

26

27

28

27

JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

## I. (a) PLAINTIFFS

PLATYPUS WEAR, INC., a Nevada Corporation, PLATYPUS WEAR, INC., a California Corporation, PW INDUSTRIES, INC., a California Corporation, and ALEXANDRIA PONCE DE LEON, in her capacities as Special Administrator and Trustee

## DEFENDANTS

HORIZONTE LTDA, a Brazilian limited partnership, FERNANDO MARIA AGOSTINHO CALDAS, JR., an individual, ROBERTO SILVA RAMOS, an individual, and DOES 1-50

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   N/A
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Michael H. Riney, Esq.
Vantage Law Group A.P.C.
600 W. Broadway, Suite 950
San Diego, CA  92101
(619) 330-3000

ATTORNEYS (IF KNOWN)
Seth A. Rafkin, Esq.
Cooley Godward Kronish LLP
4401 Eastgate Mall
San Diego, CA  92121
(858) 550-6000

07 CV 1064 L  WMC

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [X] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

(For Diversity Cases Only)

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business in This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [X] 2 | [ ] 2 | Incorporated and Principal Place of Business in Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [X] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

28 U.S.C. 1332

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reappointment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury — | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Medical Malpractice | [ ] 625 Drug Related | 28 USC 157 | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | Liability | [ ] 365 Personal Injury — | Seizure of | | [ ] 450 Commerce/ICC Rates/etc. |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Product Liability | Property 21 USC 881 | **PROPERTY RIGHTS** | [ ] 460 Deportation |
| & Enforcement of Judgment | Slander | [ ] 368 Asbestos Personal | [ ] 630 Liquor Laws | [ ] 820 Copyrights | [ ] 470 Racketeer Influenced and |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Injury Product Liability | [ ] 640 R.R. & Truck | [ ] 830 Patent | Corrupt Organizations |
| [ ] 152 Recovery of Defaulted | Liability | | [ ] 650 Airline Regs. | [X] 840 Trademark | [ ] 810 Selective Service |
| Student Loans (Excl. Veterans) | [ ] 340 Marine | **PERSONAL PROPERTY** | [ ] 660 Occupational | | [ ] 850 Securities/Commodities/ |
| [ ] 153 Recovery of Overpayment | [ ] 345 Marine Product | [ ] 370 Other Fraud | Safety/Health | **SOCIAL SECURITY** | Exchange |
| of Veteran's Benefits | Liability | [ ] 371 Truth in Lending | [ ] 690 Other | [ ] 861 HIA (1395ff) | [ ] 875 Customer Challenge |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle | [ ] 380 Other Personal | | [ ] 862 Black Lung (923) | 12 USC 3410 |
| [ ] 190 Other Contract | [ ] 355 Motor Vehicle | Property Damage | **LABOR** | [ ] 863 DIWC/DIWW | [ ] 891 Agricultural Acts |
| [ ] 195 Contract Product Liability | Product Liability | [ ] 385 Property Damage | [ ] 710 Fair Labor | (405(g)) | [ ] 892 Economic Stabilization |
| | [ ] 360 Other Personal Injury | Product Liability | Standards Act | [ ] 864 SSID Title XVI | Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 720 Labor/Mgmt. Relations | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motion to Vacate | [ ] 730 Labor/Mgmt. | **FEDERAL TAX SUITS** | [ ] 894 Energy Allocation Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | Sentence | Reporting & | [ ] 870 Taxes (U.S. Plaintiff | [ ] 895 Freedom of |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ | **HABEAS CORPUS:** | Disclosure Act | or Defendant) | Information Act |
| [ ] 240 Torts to Land | Accommodations | [ ] 530 General | [ ] 740 Railway Labor Act | [ ] 871 IRS - Third Party | [ ] 900 Appeal of Fee |
| [ ] 245 Tort Product Liability | [ ] 444 Welfare | [ ] 535 Death Penalty | [ ] 790 Other Labor Litigation | 26 USC 7609 | Determination Under |
| [ ] 290 All Other Real Property | [ ] 440 Other Civil Rights | [ ] 540 Mandamus & Other | [ ] 791 Empl. Ret. Inc. | | Equal Access to Justice |
| | | [ ] 550 Civil Rights | Security Act | | [ ] 950 Constitutionality of |
| | | [ ] 555 Prison Conditions | | | State Statutes |
| | | | | | [ ] 890 Other Statutory Actions |

## VI. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- [ ] 1 Original Proceeding
- [X] 2 Removal from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A **CLASS ACTION**  DEMAND $   
UNDER F.R.C.P. 23

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] YES  [ ] NO

## VIII. RELATED CASE(S) IF ANY  (See instructions):

JUDGE _____  Docket Number _____

DATE
June 11, 2007

SIGNATURE OF ATTORNEY OF RECORD

Seth A. Rafkin

PAID $350 6/12/07 BH RCOT
139237

"VIA FAX"

# UNITED STATES
# DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

## # 139237   — BH

## June 12, 2007
## 09:11:44

## Civ Fil Non-Pris
USAO #.: 07CV1064 CIV. FIL.
Judge..: M. JAMES LORENZ
Amount.:                    $350.00 CK
Check#.: BC# 4768

## Total—> $350.00

FROM: PLATYPUS WEAR V. HORIZONTE LTD
      CIVIL FILING